COMMONWEALTH vs. HERMAN L. HARRIS.

Hampshire.  September 14, 1982. — December 22, 1982.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law*, Assistance of counsel, Admissions and confessions. *Practice, Criminal*, Assistance of counsel. *Evidence*, Admissions and confessions. *Search and Seizure*, Consent. *Insanity*.

A defendant convicted of murdering his mother, his sister, and a boarder in his mother's home, as well as assault with intent to murder his niece, was not denied effective assistance of counsel by his attorney's failure to pursue an insanity defense where there was nothing in the record to raise any reasonable issue as to the defendant's mental condition. [759-763]

At a murder trial, there was no error in the admission of certain statements the defendant had made to police officers in his home and at the police station before he was given Miranda warnings where the defendant was not in custody when he made the statements and was not arrested for a month thereafter.  [763-765]

The record in a criminal case did not support the defendant's contention that his consent to a search of his home, given in writing in the presence of his attorney, was invalid for the reason that it was obtained after the defendant had submitted to a polygraph test and had been told that he had passed it.  [766-767]

INDICTMENTS found and returned in the Superior Court on May 4, 1977.

The cases were tried before *Moriarty, J.*, and a motion for a new trial was heard by him.

*Steven J. Rappaport* for the defendant.

*Stephen R. Kaplan*, Assistant District Attorney, for the Commonwealth.

LYNCH, J.  The defendant was convicted of murder in the first degree of his mother, Velma P. Kulis, and his sister, Mozelle J. Evans, murder in the second degree of a boarder in his mother's house, George D. Healey, assault and battery

with a dangerous weapon on his niece, Deborah A. Evans, breaking and entering in the nighttime with intent to commit a felony, entering a dwelling to commit armed assault on Deborah A. Evans, and assault with intent to murder Deborah A. Evans. Some five months after the defendant had filed a claim of appeal as to all the convictions, his trial counsel was suspended from the practice of law.[1] A new attorney was appointed to prosecute the appeal, and thereafter the defendant's pro se motion seeking appointment of present appellate counsel was allowed. On August 21, 1981, we remitted to the trial judge the defendant's motion under G. L. c. 278, § 33E, for a new trial, which alleged denial of effective assistance of counsel at trial. That motion was denied on October 16, 1981. The appeals from denial of that motion and from the convictions were argued together here. We affirm the judgments.

1. The defendant's chief contention is that his trial counsel should have investigated and determined whether he had a defense of lack of criminal responsibility. We summarize those facts material to his motion for a new trial. The bodies of Velma P. Kulis, Mozelle J. Evans, and George D. Healey were found on the morning of March 21, 1977, in their Easthampton home. Each had died of gunshot wounds of the head sustained between 10 P.M. on Saturday, March 19, and 2 A.M. on Sunday, March 20. Bullets retrieved from the bodies and the scene were handcast, i.e., not commercially manufactured. The fourth victim, Deborah A. Evans, was found alive in her bed with a gunshot wound above her left eye. Approximately 6 weeks earlier, Mrs. Kulis had instituted suit for fraud and conversion of her property in the Circuit Court of Virginia Beach, in Virginia, against the defendant, a noncommissioned naval officer stationed in Virginia. In statements to police officers, the defendant first said he had been in Virginia on March 19

---

[1] The attorney was subsequently disbarred after he was convicted of numerous charges of larceny, some of which were committed during the course of his representation of the defendant.

and 20. (He later testified that he had driven to his mother's Massachusetts home on March 19.) He admitted owning a .357 Ruger revolver and claimed to have lost a .357 Dan Wesson revolver in 1976, under circumstances he could not precisely recall. He admitted that he used hand-cast bullets and owned bullet molding equipment. A fiber taken from a broken rear window at the scene of the murders was consistent with clothing owned by the defendant.

At trial, bank employees testified that the defendant had appeared with Mrs. Kulis at a Northhampton bank in September, 1976, where Mrs. Kulis removed her own and Mozelle J. Evans's names from a certificate of deposit account and substituted the defendant's name "to protect his mother from having his sister spend the money"; that on the defendant's advice Mrs. Kulis added to the account most of the contents of her checking account, bringing the total funds to approximately $30,000; and that in November, 1976, the defendant's wife flew to Massachusetts and closed out the account, ultimately depositing the proceeds in a Virginia account from which nearly all was paid out to the couple's creditors. A Northampton insurance agency employee testified that in September, 1976, Mrs. Kulis, accompanied by the defendant, had requested a blank instrument of transfer of a truck owned by her and Mozelle J. Evans, explaining that "[the defendant] said that he could get more money in Virginia for it; and, as soon as he sold the truck, he would send her the money." The defendant testified that the truck was registered the following month in Virginia in his wife's name. An attorney representing Mrs. Kulis in November, 1976, testified that he wrote to the defendant at that time that legal action might be instituted. A fellow seaman testified that the defendant, referring to a letter received from Massachusetts, had said his mother and sister were attempting to get some money from him, and if they did not stop he would "blow them away." His stepson testified that the defendant had asked him on Friday, March 18, to say that they were together in Virginia on the night of March 19. The defendant's niece, Deborah A. Evans, who

survived a severe head wound, told police just prior to the trial that she saw the defendant enter the front door on March 19, returned to bed, later heard screaming and ran downstairs to see Mozelle J. Evans and George D. Healey falling.[2]

The defendant claims that the "bizarre" nature of the crimes with which he stood charged and the strong evidence against him should have prompted his trial counsel to investigate and discuss with him the possibility of raising a defense of lack of criminal responsibility. He attributes the failure to make this investigation to the diverting influence of his counsel's personal financial problems. Since we do not agree that the trial counsel was obligated in this instance to make such an investigation, we do not reach the issue of his motivation. We note in the margin, however, some of the trial judge's pertinent findings on that question.[3]

In considering a claim of ineffective assistance of counsel, we make the two-part determination "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substan-

---

[2] This statement contradicted Deborah A. Evans's prior descriptions of her assailant, which the defense counsel elicited at the trial, and which presumably were an important element of the defense. There was conflicting medical evidence with respect to the reliability of her statements made in the early stages of her recovery.

[3] "The trial . . . lasted five weeks, and [trial counsel] addressed each issue assiduously. He cross-examined each Commonwealth witness carefully but vigorously, and presented, in my judgment, as good a defense as the evidence would permit. In addition to the trial, he filed and pursued a pretrial motion to suppress evidence and successfully sought a change of venue . . . . [H]e received a fee from the defendant of $9,000.00 in cash, plus a conveyance of certain real estate in the State of Virginia and a conveyance of the defendant's interest in his mother's home in Easthampton, Massachusetts. That substantially exhausted the defendant's financial resources. He now suggests that [trial counsel] avoided the pursuit of an insanity defense in order to avoid the expense of expert psychiatric assistance. I find that suggestion to be completely without merit."

tial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See *Commonwealth* v. *Rondeau*, 378 Mass. 408, 412-413 (1979). The record before us, including the proceedings before the judge who heard the motion for a new trial, does not support the defendant's post-trial contention that his mental state might have been raised as a substantial ground of defense on the facts known to or ascertainable by his attorney. The defendant had no history of mental disturbance or treatment. Cf. *Commonwealth* v. *Prendergast*, 385 Mass. 625 (1982); *Commonwealth* v. *Gould*, 380 Mass. 672 (1980). He had served honorably for twenty years in the United States Navy, retiring in April, 1977, with the rank of First Class Petty Officer. Before trial he had been ordered examined and found competent to stand trial, "well oriented and in good contact . . . [having] no hallucinations or delusions . . . [able to] differentiate between right and wrong . . . not [showing] any psychotic manifestations." The examining psychiatrist concluded that "[t]he charges against him are quite serious. It is possible under stress he may be capable of committing serious acts. Perhaps a further study at Bridgewater may be advisable." The content of this report bears on the issue of trial counsel's knowledge of the defendant's mental condition. *Osborne* v. *Commonwealth*, 378 Mass. 104, 112 n.7 (1979). We agree with the judge that the psychiatrist's findings did not indicate a lack of criminal responsibility, and that his suggestion of further study, "based on no more [than] a mere possibility that under stress the defendant might be capable of serious acts . . . would be a slim reed on which to build an insanity defense." We conclude that the facts known or accessible through minimal diligence to the trial counsel were not sufficient to raise a reasonable doubt as to the defendant's mental condition. *Osborne* v. *Commonwealth, supra* at 111. Trial counsel's objection to further psychiatric examination proposed by the Commonwealth was reasonable with respect both to the evidence he had of his client's mental condition and to his client's unswerving insistence that he was innocent. At the hearing on

the motion for a new trial, trial counsel testified that he had urged the defendant to be truthful with him, explaining that this would determine how the charges would be defended. The defendant maintained his innocence throughout the trial, taking the stand and denying he had fired the shots. He repeated this denial at the posttrial hearing. Assuming the possibility of requiring the Commonwealth to prove both capacity and commission, it is too plain for discussion that the exhibition to the jury of the defendant as a lucid witness maintaining that he did not commit the acts could only weaken and be weakened by an alternative defense that he lacked legal responsibility for those acts.

Without passing upon the defendant's characterization of these crimes, their "bizarre" nature would not, standing alone, have been sufficient evidence of lack of criminal responsibility to raise a jury issue. *Osborne* v. *Commonwealth, supra* at 111. See *Commonwealth* v. *Mattson,* 377 Mass. 638, 641-645 (1979). Moreover, there was evidence here that the crimes were not senseless but specifically motivated and deliberately planned and executed. The mere fact that the evidence against the defendant was very strong would not have justified asserting an unwarranted defense. In all the circumstances, including the testimony received on the motion for a new trial, we will not fault trial counsel for failing to explore a defense which the record does not show could reasonably have been raised. *Commonwealth* v. *Stevens,* 379 Mass. 772, 774 (1980). See *Commonwealth* v. *Bernier,* 359 Mass. 13, 21-22 (1971).

2. The defendant challenges the admission of statements he made to police officers in his home and at the police station on March 22, and of evidence seized from his home on that date and on April 5 and April 21. We summarize the facts found by the judge after hearing the defendant's motion to suppress this evidence. A Massachusetts State police trooper, Thomas J. O'Connor, and an Easthampton police detective, Richard J. Lavalle, were dispatched to Virginia Beach on March 21 to gather information from the defendant and his family. At this time the police knew that the

defendant had had a dispute with his mother leading to a lawsuit. Four other persons having histories of hostility toward Velma P. Kulis, Mozelle J. Evans, or Deborah A. Evans were also under police investigation. Joined by a Virginia Beach police detective, Trooper O'Connor and Detective Lavalle arrived at the defendant's home at approximately 12:30 A.M. on March 22, where the defendant and his two grown stepchildren were still up and dressed. In the course of a one-half hour interview, the defendant said he had spent the night of March 19 with his wife and that he owned several hunting rifles and a .357 Ruger revolver. During the forenoon of March 22, the police learned from firearms records that the defendant's wife had purchased a .357 Dan Wesson revolver in 1975. Although the handcast and handloaded .38 calibre bullets used in the crimes could have been fired by a .357 revolver, both the Ruger and Dan Wesson have a righthand twist; at this point in the investigation, the police mistakenly believed that a gun with a lefthand twist had been used.

Before noon on March 22, the defendant was called by Officer Francis H. Drew and asked to come to the Virginia Beach police station that day. When he answered that he had other plans, he was asked to come in the following day. The defendant decided to rearrange his schedule and arrived that afternoon with his wife and stepchildren. At the station he met privately with Trooper O'Connor and Detective Lavalle. From this session emerged the defendant's statements that he had lost the Dan Wesson revolver during a 1976 fishing trip but could not remember exactly where; that he was aware that his wife had called his mother and threatened to leave him unless Mrs. Kulis dropped her civil action; that the $30,000 which he had spent was rightfully his as the proceeds of investments made with his funds; that the truck had been a gift from his mother; and that he handcrafted and handloaded his own ammunition with equipment he had at home. Separate questioning of the defendant's wife and stepson brought forth material discrepancies with respect to his whereabouts on the night of March 19

and the loss of the revolver. The defendant was then given Miranda warnings. An exchange between him and Trooper O'Connor at this point was suppressed by the judge, as were the results of a polygraph test to which the defendant submitted later that day.

The defendant now claims that a "coercive and inherently compelling situation" requiring Miranda warnings was created by the police officers in his home and at the police station on March 22. He argues that statements he made before he was given the warnings and all evidence arising from them, including the fruits of three searches of his home, should have been suppressed as tainted. We disagree. Neither the statement he made in his home nor those he made at the police station prior to receiving Miranda warnings were the product of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966). The defendant had already been notified by the police of the murder of his mother and sister when he admitted the officers to his home. The interview there was free of coercion. The defendant was not a prime suspect at the time. See *Beckwith* v. *United States,* 425 U.S. 341, 345-348 (1976). Later that day, when the defendant told a police officer it would be inconvenient for him to come to the station that day, the officer suggested another day. The defendant himself chose to come in that afternoon. Although his interview with Trooper O'Connor and Detective Lavalle was conducted in private, no suggestion was made that he was not free to leave, nor was he restrained in any way. He was not arrested for one month thereafter. Miranda warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon* v. *Mathiason,* 429 U.S. 492, 495 (1977). See *Commonwealth* v. *Bookman,* 386 Mass. 657, 660 (1982); *Commonwealth* v. *Best,* 381 Mass. 472, 493-494 (1980).

The three searches of the defendant's home were proper. The March 22 search was consented to while the defendant was still at the police station where he had been joined by his Virginia attorney. Consent was given in writing, witnessed by his attorney, and the search was carried out in the presence of the defendant, members of his family, and the attorney. The defendant now complains that his consent was invalid because obtained after he had submitted to a polygraph test and been told that he had passed it.[4] The record does not support this contention. Officer Drew, who administered the examination, testified at the suppression hearing. His report of the test results concluded that Harris's reactions "were not as strong as they should have been on a person who murdered his mother and shot three other people," and that the examination was "inconclusive, with some deception indicated." Officer Drew testified that he had discussed his opinion of the results with the defendant at the conclusion of the test, and had indicated to him the lack of strong reactions, the inconclusiveness of the examination, and his recommendation that the defendant be given another polygraph test. The record also shows that the defendant conferred privately with his attorney immediately after this discussion. The trial judge found that the defendant's subsequent consent to a search of his home "was given with the hope that his cooperation would result in his elimination as a suspect in the case." This conclusion is entitled to substantial deference by this court. *Commonwealth* v. *Angivoni*, 383 Mass. 30, 33 (1981), and cases cited. We are satisfied that in these circumstances the defendant freely and voluntarily consented to the search. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 233 (1973). *Commonwealth* v. *Walker*, 370 Mass. 548, 554-555, cert. de-

---

[4] The defendant also raises an objection to the questions asked on the polygraph examination. All aspects of the examination were suppressed by the trial judge except one statement made by the defendant to Officer Drew prior to his administration of the test. We have not located or been cited to a portion of the transcript wherein that statement or any reference to the polygraph examination appears.

nied, 429 U.S. 943 (1976).[5] It follows that the warrant searches of the defendant's home, conducted on April 5 and April 21 and based in substantial part on information obtained during the police interviews and consent search of March 22, were not constitutionally invalid.

On examination of the entire record we conclude that this is not a case in which we should exercise our power under G. L. c. 278, § 33E, to order the verdicts reduced to a lesser degree.

*Judgments affirmed.*

---

[5] That the defendant may not have been advised of his right to refuse to consent to the search would not vitiate his consent on this record. Here he had an opportunity to confer with his own attorney prior to consenting to the search. In any case, failure to inform a person of his unqualified right to withhold consent is a factor to be considered, but is not determinative of voluntariness. *Commonwealth* v. *Walker,* 370 Mass. 548, 554-555, cert. denied, 429 U.S. 943 (1976). Here there was ample evidence to support the judge's finding. *Commonwealth* v. *Cantalupo,* 380 Mass. 173, 176-178 (1980). *Commonwealth* v. *Buchanan,* 384 Mass. 103, 106-107 (1981).