COMMONWEALTH *vs.* MICHAEL J.F. SANNA.

Plymouth. September 5, 1996. - January 13, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Search and Seizure,* Consent, Probable cause. *Constitutional Law,* Search
and seizure. *Arrest. Practice, Criminal,* Motion to suppress, Admissions
and confessions, Instructions to jury, Argument by prosecutor, Capital
case. *Probable Cause. Evidence,* Admissions and confessions. *Malice.
Intoxication. Homicide. Mental Impairment.*

In a criminal case, there was no error in the judge's finding that police of-
ficers investigating a murder properly entered the defendant's home with
the valid consent of the defendant's father, the owner of the house, who
was informed of the officer's purpose to question the defendant. [96-99]

In a criminal case, the judge correctly concluded, on conflicting evidence,
that the defendant did not request legal counsel before his interrogation
by police. [99-100]

At the trial of an indictment for murder in the first degree, error, if any, in
the judge's instruction to the jury on the issue of the third prong of
malice could not have prejudiced the defendant's case, where the evi-
dence of the defendant's intoxication was not substantial or relevant and
where the judge's instructions as a whole adequately informed the jury
of their duty to weigh any evidence of the defendant's intoxication when
considering the defendant's knowledge of the circumstances of the kill-
ing. [100-105]

At the trial of a first degree murder indictment the judge correctly declined
to instruct on involuntary manslaughter, where the injuries sustained by
the victim, including thirty-four stab wounds and fifteen blows to the
head, created a strong likelihood of death so that there was not an issue
of any lesser degree of risk of harm [105], and where there was no evi-
dence that the defendant knew he was acting so as to cause a risk of
harm less than a strong likelihood of death [106].

At a murder trial there was no basis in the evidence for the judge to have
given an instruction on lack of criminal responsibility. [106]

A criminal defendant was not entitled to the reversal of his conviction of
murder in the first degree because of alleged improprieties in the
prosecutor's closing argument. [106-108]

No reason appeared for this court to exercise its power under G. L. c. 278,
§ 33G, to reduce a verdict of first degree murder or to grant a new trial.
[108]

INDICTMENT found and returned in the Superior Court
Department on December 2, 1991.

A pretrial motion to suppress evidence was heard by *Cortland A. Mathers*, J., and the case was tried before *Robert L. Steadman*, J.

*Donald A. Harwood* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. A Superior Court jury found the defendant guilty of murder in the first degree by reason of extreme atrocity or cruelty. On appeal, the defendant contends that the motion judge improperly denied his motion to suppress evidence, and that the trial judge committed reversible error by improperly instructing the jury on the third prong of malice aforethought and omitting instructions on involuntary manslaughter and criminal responsibility. The defendant also argues that the prosecutor's closing argument was improper. Last, the defendant asks that we reduce the verdict pursuant to G. L. c. 278, § 33E (1994 ed.). We affirm the judgment and decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* We summarize the facts as the jurors could have found them, in the light most favorable to the Commonwealth. *Commonwealth* v. *Judge*, 420 Mass. 433, 435 (1995). On October 12, 1991, the police found the body of the victim lying in a pool of blood in his apartment. The seventy-four year old victim lived in an elderly housing project in Abington and was a great-uncle of the defendant. An autopsy revealed that the victim died from thirty-four knife wounds and from more than fifteen blunt impact wounds to his head. The apartment was in disarray, but the police found no evidence of a forced entry.

Sergeant Paula Loud of the State police was given the responsibility of investigating the homicide. During the inspection of the crime scene, the police found a number of fingerprints throughout the apartment. On October 14, 1991, State police positively matched at least one of the fingerprints found with the defendant's fingerprint card on file with the bureau of criminal investigation. In the course of their investigation Sergeant Loud and Richard Franey, the Abington chief of police, went to the home of the defendant's

parents without a search warrant or an arrest warrant.[1] They parked their unmarked police automobile in the driveway behind a red Audi automobile, which was occupied by the defendant's father. The defendant's father left the Audi and approached the officers, who were in plain clothes. He recognized Chief Franey whom he had known for years. Sergeant Loud introduced herself as a police officer.

The defendant's father led the officers into the living room of the house.[2] The officers found the defendant reclining on a couch, a blanket covering his legs, speaking on the telephone. He ended his telephone conversation shortly after the arrival of police, whereupon Sergeant Loud removed the blanket from the defendant's legs and asked him to stand up and show his hands. Sergeant Loud saw cuts on the defendant's forehead and hands, and on closer inspection, numerous other cuts and scratches on both sides of his hands.[3] At this point, Sergeant Loud arrested the defendant.

After being read his Miranda rights the defendant said he understood them.[4] The police escorted the defendant to a police cruiser. The defendant neither requested a lawyer nor told the officers that he had a lawyer at any time after the arrest.[5]

The defendant was then taken to the Abington police station, where Sergeant Loud again read him his Miranda rights and he again acknowledged he understood them. She further asked whether he wished to use the telephone and he

[1] A number of additional officers accompanied Sergeant Loud and Chief Franey to provide back-up security. They were stationed in the areas around the house.

[2] The defendant's father testified that he neither feared the officers nor did he feel uncomfortable about their entry into his house. He believed that, "they had a right to speak to [the defendant]."

[3] These injuries were consistent with those often found resulting from a fight with a knife.

[4] The defendant is a high school graduate, and had begun his second semester as a student at Massasoit Community College.

[5] The defendant's father later testified that as the police escorted the defendant out of the house, the defendant had asked his father to call his lawyer. Both Sergeant Loud, who accompanied the defendant out of the house, and Chief Franey, who was with the defendant's father, testified that they did not hear this request. The motion judge found as a matter of fact that the defendant did not request a lawyer in either officer's presence while he was at home.

declined.[6] After booking, the police took the defendant to the detective's room where, during interrogation, he denied having used any drugs, alcohol, or medication that day and he described the events of October 11, 1991, finally admitting to killing the victim.

According to the defendant's statement, he was addicted to cocaine but had been "clean" for 120 days. On October 10, 1991, however, he "slipped." On October 11, 1991, he telephoned the victim and visited at about noon, during which the victim gave the defendant $10 as a birthday present. The defendant left in his mother's Buick automobile and later consumed between two and one-half to three grams of cocaine while in the car. At about 7 or 8 P.M., he returned to the victim's apartment to use the bathroom. As he was leaving, the defendant took the victim's wallet, and used money he found in the wallet to buy more cocaine. The defendant returned again to the victim's apartment, where an argument ensued over the stolen wallet. At that time, the defendant was carrying a knife that he had taken from his parents' house because he had been contemplating suicide.

During the argument, the victim shoved the defendant, which made him "really angry." As a result, the defendant attacked the victim with the knife, striking him between the throat and chest area. Shocked at his own actions, the defendant dropped the knife. The victim picked up the knife and asked, "Michael John, what are you doing?" The defendant grabbed at the knife, and the two struggled. Something "banged off [the defendant's] head and really pissed [him] off some more," so the defendant struck at the victim several more times. Finally, the defendant, with the victim lying unconscious on the floor, left the apartment and returned home. When asked why he had killed the victim, the defendant replied, "I don't know. I was coked up when he shoved me. It made a spark."[7]

When the defendant had finished giving his statement, he

---

[6]In addition, the booking officer noted on the booking sheet that the defendant had been advised of his Miranda rights and that he had declined to use the telephone. Moreover, after Sergeant Loud had recited his rights, the defendant signed the booking sheet where it stated, "I was informed of my right to remain silent, to use a phone, to call a lawyer, or to have one provided for me."

[7]The defendant's testimony during trial contradicted the statement which he had given to the police. His testimony diverged from his prior statement

stated that he understood that the information could be used against him. On further questioning by Chief Franey, he revealed that he had a lawyer. However, the defendant declined to make a telephone call to his lawyer, and he declined Chief Franey's offer to find his lawyer's telephone number.

2. *Warrantless search and seizure.* The defendant argues that his warrantless arrest in his home and the observation of the cuts on his hands exceeded State and Federal limitations on searches and seizures by the police. As a result, the defendant argues that his subsequent statement to the police and any evidence stemming from the arrest should be suppressed under the fruit of the poisonous tree doctrine.[8] We disagree.

The Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution prohibit warrantless arrests in the home or warrantless searches and seizures, "absent exigent circumstances or consent."[9] *Commonwealth* v. *Voisine,* 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Derosia,* 402 Mass. 284,

on his return to the victim's apartment with the victim's wallet. This time, the victim, not the defendant, first drew a knife. The two struggled, and the defendant shoved the victim. As the defendant approached the victim, the door to the apartment opened. The defendant looked up and "all [he] saw was black," having been struck on the head by a third party. He woke up in a pool of blood, and found the victim lying on the floor. The defendant also testified that he did not recall whether he had stabbed the victim or hit him with a television set. Moreover, he testified that he did not recall what he had told the police after his arrest, nor did he recall ever being advised of his Miranda rights.

[8]We note that, even if the warrantless arrest of the defendant in his home was conducted without consent, his statement to the police, given while in custody, may still be admissible. In 1990, the United States Supreme Court held in *New York* v. *Harris,* 495 U.S. 14, 21 (1990), that, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar [the admission] of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of [his rights under] *Payton* [v. *New York,* 445 U.S. 573 (1980)]." We have not yet considered whether the Commonwealth follows the holding of *New York* v. *Harris,* and because we do not need to settle this issue of law to resolve this case, we decline to do so today.

[9]"Police may not make a warrantless entry into the home . . . to arrest a suspect or to search for or seize evidence, absent exigent circumstances or consent." *Commonwealth* v. *Voisine,* 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Derosia,* 402 Mass. 284, 286, cert. denied, 488 U.S. 980 (1988). A purpose of the rule against warrantless arrests or searches and seizures is to protect the physical integrity of the home from warrantless police intrusion. *New York* v. *Harris, supra* at 17.

286, cert. denied, 488 U.S. 980 (1988). When police seek to justify a warrantless arrest or entry on the basis of consent, the Commonwealth must show "consent unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Voisine, supra,* quoting *Commonwealth* v. *Walker,* 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). The voluntariness of an individual's consent to a warrantless entry is an issue of fact, and must be examined in the circumstances of the case. See *Commonwealth* v. *Voisine, supra; Commonwealth* v. *Harris,* 387 Mass. 758, 766 (1982); *Commonwealth* v. *Aguiar,* 370 Mass. 490, 496 (1976).

When reviewing the denial of a motion to suppress evidence, we accept the motion judge's subsidiary findings of fact absent clear error. *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990). As we stated in *Commonwealth* v. *Yesilciman,* "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses, and not this court." *Id.,* quoting *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980). Moreover, the clear error standard is a "very limited form of review," and when we are presented with conflicting evidence, "a judge's resolution of such conflicting testimony invariably will be accepted." *Commonwealth* v. *Yesilciman, supra,* quoting *Commonwealth* v. *Spagnolo,* 17 Mass. App. Ct. 516, 517-518 (1984).

The motion judge found that the police officers had first asked the defendant's father for permission to enter the house to ask the defendant about the victim's death. In response, the defendant's father had invited the officers into the house, telling them, "Come on inside," gesturing toward the door of the house, and leading the officers through the front door, into the living room where the defendant was talking on the telephone. Based on this evidence and the absence of credible evidence to the contrary, the motion judge found that the defendant's father had freely and voluntarily given consent to the police to enter his house and we accept this finding.[10] Furthermore, there is no question here that the defendant's

---

[10]The defendant argues that, in the circumstances, the consent was invalid because the police did not inform the defendant's father of his right to withhold consent, and because the police blocked the driveway of the house. That the police did not advise the defendant's father of his right to

father, who was the owner of the house and present at the time of the entry, could give a valid consent. See *Commonwealth* v. *Ortiz,* 422 Mass. 64, 70 (1996) (father validly consented to search of son's bedroom in home); *Commonwealth* v. *Walker, supra* at 554 (defendant's fiancée owned apartment; gave valid consent to police to enter in order to arrest defendant).

The defendant further argues that, even if the consent were voluntary, it was invalidated by the deceptive practices used by the police to obtain the consent. He alleges that the police had gone to his home to arrest him and that their request to question him was mere pretext used to induce his father to consent to their entry. As a preliminary matter, we do not necessarily agree with the premise of the defendant's argument that consent is rendered invalid when the police do not disclose everything that they might have in mind in seeking it. See *Colorado* v. *Spring,* 479 U.S. 564, 573-578 (1987). But in any event the factual foundation for the argument is missing since there was no finding by the motion judge that the officers attempted to deceive the defendant's father. Furthermore, it is noteworthy that the evidence against the defendant intensified during their interrogation.

In addition, the defendant contends that the arrest exceeded the scope of the consent. However, in *Commonwealth* v. *Cantalupo,* 380 Mass. 173, 178 (1980), we stated:

> "[What] limitations on the consent are implied by the language or conduct of the consenting party is a question in the first instance for the judgment of the police officers to whom the consent is given. The ultimate question is whether, in light of all the circumstances, a man of reasonable caution would be warranted in the belief that some limitation was intended by the consent giver."

withhold consent to the police entry into the house does not vitiate the consent. The fact that a person is not informed by the police that he has a right to refuse to consent to an entry or search is a factor to be considered on the issue of voluntariness, but is not determinative of the issue. See *Commonwealth* v. *Harris,* 387 Mass. 758, 747 n.5 (1982); *Commonwealth* v. *Walker,* 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). In addition, although the police did park their unmarked automobile behind the defendant's father's automobile, the motion judge was entitled to find that this action was not coercive in effect. In sum, notwithstanding the defendant's arguments, the motion judge found that, in the circumstances of this case, the consent was given freely and voluntarily.

In the instant case, the defendant's father's words and actions placed no limitations on the scope of the entry to which he was consenting. He had said to the officers, "Come on in," led them into the house, and into the living room where the defendant sat. In the circumstances, an arresting officer, acting reasonably, would have believed the defendant's father granted the officers permission to enter the premises to question the defendant. It is significant that the officers had alerted the defendant's father that they were going to question the defendant about the victim's murder and that the father understood this when he gave them permission to enter the house. Because there was no implied limitation to the consent given by the defendant's father, the police did not exceed the scope of the consent when they questioned and observed the defendant. In sum, there is no reason for us to disturb the motion judge's finding that the police had properly entered the defendant's home on the consent given by the father.

3. *Probable cause.* The defendant also seeks to suppress his confession and other evidence obtained as a result of his statement, on the basis that the police did not have probable cause to arrest him at the time they entered his home. This argument improperly assumes that the police required probable cause to enter the defendant's house. Probable cause is not required when the police have consent to conduct a search and seizure. See, e.g., *Commonwealth* v. *Sergienko,* 399 Mass. 291, 296 (1987). As we have accepted the motion judge's determination that the police had properly entered the house with the consent of the defendant's father, probable cause was not required at the time of entry.[11]

4. *Miranda rights.* The defendant challenges the admission

---

[11]The defendant further argues that the arresting officers did not have probable cause to arrest him. Probable cause to arrest exists where, "at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed . . . an offense." *Commonwealth* v. *Santaliz,* 413 Mass. 238, 241 (1992). The motion judge found that the matched fingerprints considered in conjunction with the cuts on the defendant's face and hands satisfied the probable cause requirement. We agree.

The defendant contends, however, that the officers' observations of the injuries on his face and hands could not be used to establish probable cause to arrest him. He argues that the removal of the blanket from his legs constituted an illegal search and seizure without probable cause or consent. Even if the removal of a blanket from the defendant's legs was improper,

of his confession and evidence obtained following the confession, on the basis that the police obtained his statement in violation of his rights under *Miranda* v. *Arizona,* 384 U.S. 436 (1966), and its progeny. Under the Fifth and Fourteenth Amendments to the Constitution of the United States, when a suspect requests counsel, police interrogation must cease until an attorney is present. See, e.g., *Edwards* v. *Arizona,* 451 U.S. 477, 484-485 (1981); *Commonwealth* v. *Mandeville,* 386 Mass. 393, 402 (1982). The defendant claims that, as the police escorted him out of his home under arrest, he had asked his father in the presence of the arresting officers to contact legal counsel. The testimony of the arresting officers, however, directly contradicted that of the defendant and his father. All three of the arresting officers testified that the defendant did not request legal counsel. The motion judge was entitled to resolve this conflict in the testimony. *Commonwealth* v. *Day,* 387 Mass. 915, 919 (1983).[12]

5. *Jury instructions on malice aforethought.* The defendant challenges the judge's failure to instruct the jury to consider evidence of the defendant's intoxication at the time of the homicide on the issue of malice aforethought. While the judge's instruction on the effect of intoxication on the third prong of malice was lacking in clarity, we decline to reverse the conviction and order a new trial because we find that any error in this regard could not have prejudiced the defendant's case.

In order to convict a defendant of murder, the jury must find that the defendant acted with malice aforethought. Under what has come to be known as the third prong of malice, its existence may be inferred if, "in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the

the injuries to the defendant's hands and face were at all times in plain view.

[12] The defendant also asserts that the Miranda warnings given by the officer at the time of arrest were inadequate because they did not include the "fifth warning" informing the defendant of his right to stop any questioning at any time. This court, however, held in *Commonwealth* v. *Lewis,* 374 Mass. 203, 205 (1978), that the "fifth warning" is neither required by Federal law, nor is it required by the law of this Commonwealth. See also *Commonwealth* v. *Day,* 387 Mass. 915, 918 n.7 (1983). An omission of the "fifth warning" at the time of arrest would not violate the defendant's Fifth and Fourteenth Amendment rights.

contemplated act."[13] *Commonwealth* v. *Grey,* 399 Mass. 469, 470 n.1 (1987).

In *Commonwealth* v. *Sama,* 411 Mass. 293 (1991), we discussed whether a defendant was entitled to have the jury consider evidence of his intoxication in deciding whether the Commonwealth had proved the knowledge requirement of the third prong of malice. *Id.* at 298. We held that it was error not to instruct the jury, on the defendant's request, that the jury may consider evidence of defendant's intoxicated state on this issue, stating that, "[u]nder the third prong of malice, the Commonwealth must establish the guilty *knowledge* of the defendant beyond a reasonable doubt, and evidence of a defendant's intoxication should be considered by the jury" (emphasis in original). *Id.*

In *Commonwealth* v. *Sires,* 413 Mass. 292 (1992), this court considered whether the judge's error of omitting the defendant's requested jury instruction on the effects of the defendant's intoxication on the third prong of malice required a reversal of the defendant's conviction. In explicating this issue the court stated that, "[a]lthough the judge erred in his statement of the law, the error would not require reversal of the defendant's conviction if there was no evidence that the defendant did not know what he was doing at the time of the killing." *Id.* at 299. See *Commonwealth* v. *Blake,* 409 Mass. 146, 155-156 (1991) (defendant not entitled to instruction on effects of intoxication on third prong of malice where no showing that intoxication had any relevant effect on knowledge of circumstances of killing).[14] Where no evidence exists that the defendant did not have knowledge of the circum-

[13]The definition of malice aforethought, as set forth in *Commonwealth* v. *Grey,* 399 Mass. 469, 470 n.1 (1987), and its progeny, has three "prongs:" (1) specific intent to cause death; (2) specific intent to cause grievous bodily harm; or (3) knowledge of a reasonably prudent person that, in the circumstances known to the defendant, the defendant's act was very likely to cause death. See *Commonwealth* v. *Judge,* 420 Mass. 433, 437 (1995).

[14]In *Commonwealth* v. *Doucette,* 391 Mass. 443, 455 (1984), we addressed the related issue whether a jury may consider the effects of a defendant's state of intoxication on whether a killing was committed with extreme atrocity or cruelty. We held that a defendant is entitled to an instruction that a jury may consider the defendant's intoxication in deciding extreme atrocity or cruelty, but that these instructions, "although required if requested, are not constitutionally based." *Id.* Similarly, although we required in *Commonwealth* v. *Sama, supra,* that the judge give instructions permitting the jury to consider the defendant's intoxication on

stances of the killing, an error in the instruction on the effect
of intoxication on the defendant's knowledge does not consti-
tute reversible error. The question is, therefore, whether there
is evidence which would warrant a jury finding that the de-
fendant was unaware of the circumstances of the homicide at
the time of the act. In *Commonwealth* v. *Sama, supra* at 299,
there was "credible evidence of debilitating intoxication bear-
ing on his ability to have meaningful knowledge of the cir-
cumstances at the time of the victim's death."[15] In contrast,
here, as in *Commonwealth* v. *Sires, supra,* the evidence on the
defendant's state of mind at the time of the homicide is both
far less substantial and far less relevant.[16]

The defendant testified that, on the day of the homicide, he
was "fogged out" from the crack cocaine that he had ingested,
and that he could not remember whether he had attacked the
victim. However, he acknowledges that he was in the victim's
apartment immediately before and after the crime, and that
he had a knife in his hand that he claimed he had taken from
the victim. He did not directly testify to the circumstances of
the crime or to what his state of mind was at the time. We do
know from his testimony that he was fully aware of the cir-
cumstances immediately before and after the crime. That he
now says he has no memory of the killing tells us nothing
about the defendant's state of mind at the time of the killing.
*Commonwealth* v. *Sires,* 413 Mass. 292, 300 (1992). His
defense in this case was essentially that someone else was the
perpetrator. Moreover, in contrast to his testimony during
trial, the defendant's statement to the police given two days
after the killing showed that the defendant did in fact
remember his actions, thoughts, and emotions in detail at the

the issue of third prong malice, this right also is not constitutionally based.

[15]In *Commonwealth* v. *Sama, supra,* the defendant testified that he had a
long history of uncontrolled alcoholism which had caused memory loss in
the past. The defendant's father also described the defendant's chronic
substance abuse and his perception of the resulting mental impairment.
Last, an expert witness opined that the defendant could have hallucinated
at the time of the killing due to the melange of drugs and alcohol he had
taken earlier that day.

[16]In *Commonwealth* v. *Sires,* 413 Mass. 292, 300 (1992), the defendant
had testified in a trial on the same crime that he, "did not remember
anything about shooting his mother," and that this loss in memory was due
to his state of intoxication. However, during his first trial, the defendant
had testified extensively on the killing, describing his actions, and the
dialogue between himself and his victim.

time of the homicide. The defendant's version of the facts, if the jury believed it, would have resulted in acquittal. From the verdict returned by the jury, however, it is evident that they did not credit the defendant's testimony that someone else had struck him on the head and committed the murder. Furthermore, the judge's instructions taken as a whole were not that far off the mark. He correctly instructed the jury that they could take into consideration the defendant's impaired mental capacity because of drug use in deciding whether the murder was committed with extreme atrocity or cruelty.

In instructing the jury on the three prongs of malice aforethought, however, the judge stated: "A defendant's mental impairment because of the voluntary use of drugs is one of the factors you must and should consider in your deliberations on the issue of whether the defendant had specific intent to kill or grievously injure the victim." The defendant made a timely objection to the judge's instructions.

After one or two hours of deliberation the jury asked the judge to clarify his instructions on malice, and the judge responded:

> "I've also instructed you that the defendant's mental impairment from the voluntary use of drugs is one of the factors you should consider in your deliberations on the issue of whether the defendant had the specific intent to kill or grievously injure the victim. You may also consider intoxication by drugs on the subjective components of malice. That is, if you find that there was an impairment of his mental capacity caused by the ingestion of the drugs, you are to consider that impaired mental capacity in determining what circumstances were known to the defendant as it relates to whether a reasonably prudent person would have known that there was a plain and strong likelihood that according to common experience death of the victim would follow those actions.

> "The burden of proof is, of course, on the Commonwealth to prove that the defendant was not so mentally impaired by drugs that he was unable to determine the circumstances surrounding the act or form the necessary specific intent to kill."

He concluded his additional charge by stating:

> "Therefore, if, after considering all of the evidence in this case, you find that the Commonwealth has proven beyond a reasonable doubt each of the three elements that I have previously given you: one, that the defendant committed an unlawful killing; two, that the killing was committed with deliberate premeditation; and three, that the killing was committed with malice aforethought, then you are warranted to find the defendant guilty of murder in the first degree committed with deliberate premeditated malice aforethought.

> "If, however, after your consideration of all the evidence, you find the Commonwealth has not proven any one of these three elements beyond a reasonable doubt, you must find the defendant not guilty of murder in the first degree under the principles of deliberate premeditated malice aforethought."

We conclude that this supplemental charge adequately informed the jury of their duty to weigh any evidence of the defendant's intoxication when considering the defendant's knowledge of the circumstances of the killing. The fact that the judge clarified his instruction after two hours of jury deliberation is not fatal to the Commonwealth's cause. *Commonwealth* v. *Gilliard*, 36 Mass. App. Ct. 183, 191 (1994).

After the supplemental charge referred to above the defendant requested a further charge[17] that explained to the jury that malice was an element of murder in the second degree, as well as first. In giving this additional charge the judge stated:

> "This jury may consider the evidence in this case concerning the defendant's use of drugs, that is, whether the defendant was under the influence of drugs at the time of the commission of the offense. You may consider this on the issue of whether the prosecution has proved the defendant had the specific intent to kill or grievously injure the victim beyond a reasonable doubt."

Although the judge failed to explain that intoxication is a fac-

---

[17]The defendant also moved for a mistrial. This claim has been abandoned on appeal.

tor to be considered in deciding whether the third prong of malice exists, since this additional unobjected-to instruction was clearly limited to murder in the second degree, this failure did not prejudice the defendant.

6. *Instructions on involuntary manslaughter and lack of criminal responsibility.* The defendant argues that the judge erred in failing to give instructions on involuntary manslaughter. We disagree.

A conviction of involuntary manslaughter can be based on two independent theories. *Commonwealth* v. *Pierce*, 419 Mass. 28, 33 (1994). The first concerns an unintentional killing resulting from "a battery not amounting to a felony which the defendant knew or should have known endangered human life." *Id.* The second involves "wanton and reckless conduct causing death." *Id.* "An instruction on manslaughter is required when any view of the evidence will permit a finding of manslaughter and not murder." *Id.* In this case, the only manslaughter theory potentially applicable is that of wanton and reckless conduct. However, "[t]he difference between the elements of the third prong of malice and wanton and reckless conduct amounting to involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew." *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992). For the purposes of third prong malice, the risk is that there was a "plain and strong likelihood of death . . . The risk that will satisfy the standard for wilful and wanton conduct amounting to involuntary manslaughter 'involves a high degree of likelihood that substantial harm will result to another.' " *Id.* at 303-304 n.14, quoting *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). Consequently, "when it is obvious . . . that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required." *Commonwealth* v. *Pierce*, *supra.* Here, there was never an issue of the degree of risk of harm involved in the defendant's actions. Given the brutality and force involved in this case, the physical injuries sustained by the victim, including thirty-four knife wounds and fifteen blows to the head, were so great that it certainly "created a strong likelihood that death would follow." *Id.* Thus, no instruction on involuntary manslaughter was required.

Nonetheless, the defendant argues that, because of the evidence of his mental impairment due to intoxication, the jury would have been warranted in concluding that malice was not proved beyond a reasonable doubt, and hence the failure to instruct on involuntary manslaughter was error. Since there is no distinction between the knowledge of the facts that created the objectively ascertainable risk required for the third prong of malice and that required to support a conviction of involuntary manslaughter, this argument is unavailing. A killing without malice aforethought does not automatically constitute involuntary manslaughter. *Commonwealth* v. *Sires, supra* at 302. Here there was no evidence that the defendant knew he was acting so as to cause a risk of harm less than a strong likelihood of death. *Id.* It was not error to deny the defendant's request for instructions on involuntary manslaughter. *Commonwealth* v. *Pierce, supra* at 34.

The defendant also claims that the judge improperly declined to allow the jury to consider the effect of intoxication on the defendant's criminal responsibility. The defendant relies on *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), which set out the standard for a lack of criminal responsibility due to mental disease or defect.[18] However, we have consistently held that "neither alcoholism nor drug addiction is a disease or defect which, alone, can trigger the application of *McHoul*." *Commonwealth* v. *Blake*, 409 Mass. 146, 157 (1991). See *Commonwealth* v. *Brennan*, 399 Mass. 358, 361 (1987) (alcoholism); *Commonwealth* v. *Sheehan*, 376 Mass. 765, 770 (1978) (drug addiction). In the instant case, any assertion of mental disease or defect must rely solely on the defendant's voluntary ingestion of crack cocaine, because the issue of the defendant's sanity was not otherwise raised by the evidence. We conclude that there was no basis for the judge to instruct on involuntary manslaughter or give a *McHoul* instruction on lack of criminal responsibility.

7. *The prosecutor's closing argument.* The defendant urges us to reverse his conviction because of certain alleged

---

[18]The standard for criminal responsibility, set out in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), provides: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

improprieties in the prosecutor's closing remarks to which timely objections were made.

Although the prosecutor's remarks were, "enthusiastic rhetoric, strong advocacy, and excusable hyperbole," they did not cross the line between fair and improper argument.[19] *Commonwealth* v. *Costa*, 414 Mass. 618, 628 (1993). Although the judge made no specific mention of the prosecutor's remarks in his charge, he did instruct the jury that closing arguments did not constitute evidence and had "no probative value whatsoever." Moreover, the judge specifically emphasized that the jury had to consider the evidence dispassionately and decide the case without sympathy or prejudice. We have said that, "[a] certain measure of jury sophistication in sorting out excessive claims on both sides may fairly be assumed." *Commonwealth* v. *Yesilciman, supra,* quoting *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). Moreover, even in close cases where a prosecutor has transgressed the line between fair and improper argument, "we must and do recognize that closing argument is identified as argument, the jury understands that, instructions from the judge inform the jury that closing argument is not evidence, and instructions may mitigate any prejudice in the final argument." *Commonwealth* v. *Kozec, supra.* Accordingly, we conclude that the prosecutor's

---

[19]The defendant's primary focus is on the following portions of the prosecutor's closing:

"[O]n October 11th of 1991 Mario diCicco was a vital and an active 74-year-old man. He lived proudly in his modest but tiny apartment in Abington. He was surrounded by a family who [he] shared his holidays with, who he shared his wisdom with, who he shared his companionship with.

"Patricia Scanlon spoke with her Uncle Mario on Friday, October 11th, and when she hung up the phone she said, I'll talk to you tomorrow. She should have been able to talk to him that next day. The family should have been able to share more holidays with their Uncle Mario.

"Instead, what are we left with? A photograph of Uncle Mario smiling proudly with his niece and her nephew. A photograph that should have been displayed on Patricia Scanlon's mantle is lying before you next to a photograph of Mario diCicco's bludgeoned and slaughtered body.

"Who is responsible for this atrocious act? Who is responsible for all of you sitting here and looking at these piles of evidence of Mario diCicco's death? There is but one man who is responsible for this act. There is one man who spent his time trying to support his ugly habit. There is one man who would prey upon the humble generosity of his uncle who would accept a gift of $10 and in return leave him with 34 stab wounds and 15 blows to the head. The defendant is responsible for this vicious act and no one else."

remarks, although at times close to constituting improper argument, did not prejudicially affect the jury's deliberations.

8. *General Laws c. 278, § 33E, review.* Although the trial was not error free, the evidence against the defendant was overwhelming, and we see no basis for concluding that a reasonable likelihood of a miscarriage of justice exists.

*Judgment affirmed.*