Carhart, Judd J., J.

BACKGROUND

The Commonwealth moves for reconsideration of this court’s decision to suppress the fruits of a war-rantless search of a dwelling in the above-captioned case. Claiming this court “failed ... to examine the record at all . . .” the Commonwealth restates its position that the attached patio and shed were not curtilage and that the police did not search Apartment 22-D, in the constitutional sense, because neither defendant had an expectation of privacy there. Such an assertion is unfounded because: (1) I was present and attentive at the evidentiary hearing, and (2) I have reviewed a transcript of the evidentiary hearing. In consideration of the Commonwealth’s Motion, I make the following supplemental findings of fact and deny the Motion for Reconsideration.

A. The Curtilage of Apartment 22-D

The Commonwealth, misinterpreting Commonwealth v. McCarthy, 428 Mass. 871 (1999), and selectively paraphrasing Commonwealth v. Thomas, 358 Mass. 771 (1971), re-asserts the notion that Apartment 22-D’s attached back patio and shed are actually common areas of a modern, urban apartment building. Invoking McCarthy, the Commonwealth presses for the application of modem, urban apartment authority to the attached back patio and shed of Apartment 22-D. The Commonwealth claims “[t]his Court has failed to distinguish those cases where the property involved is a private home from those where an apartment complex is involved. Private homes and apartments are looked at differently when determining what is curtilage and a tenant’s dwelling does not extend much beyond the actual apartment. McCarthy at 876 . . . How closely something is attached to a dwelling or what types of property are stored in or around an area are not highly relevant factors in determining whether an area is in fact curtilage.” Comm. M. to Recon. ¶1.
McCarthy states otherwise. There are “four factors to consider in deciding if a particular area is within the curtilage: (1) the proximity of the area to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observations by people passing by.” McCarthy at 874, citing United States v. Dunn, 480 U.S. 294, 300-01 (1987). Loosely utilizing these factors, the McCarthy court assessed an unassigned visitor’s parking space located in a forty-space parking lot twenty-five feet away from a large urban apartment building’s common side door. The court determined that this unassigned parking space was not the curtilage of one specific apartment.
The instant case concerns the attached shed and patio of a somewhat rural six-unit apartment building, located approximately six feet away from the back door of its particular dwelling. Here, (1) the patio and shed are attached to the dwelling unit, making them well within its proximity, (2) although there is some fencing and natural boundary material, a man-made enclosure does not completely surround the area, (3) the type of property stored on the patio and against the shed clearly indicate the nature of the area’s use as a functioning extension of the dwelling, and (4) no people are likely to pass by this area in the normal course of events.
Next, the Commonwealth pincites Thomas for the following statement: “In multifamily apartment houses the area within the curtilage is much more limited, to those areas under the exclusive control of the tenant.” Comm.’s M. to Recon., ¶2. The actual passage reads somewhat differently. “In a modern urban multifamily apartment house the area within the curtilage is necessarily much more limited than in the case of a rural dwelling subject to one owner’s control. In such an apartment house, a tenant’s dwelling cannot reasonably be said to extend beyond his *508 own apartment and perhaps any separate areas subject to his exclusive control." Thomas, 358 Mass, at 775.
The Commonwealth stipulated the patio is “clearly” part of Apartment 22-D’s curtilage. Commonwealth’s Opp’n to Def s. M. to Suppress. There is no dispute the shed in question was “attached to the back of [Apartment] 22-D.” Testimony of Sergeant Kovitch, Transcript 18, line 23-24; Photo Exhibits. Sergeant Kovitch, who made the discovery, described the narcotics as being “a few inches away from the foundation [of the shed].” He later clarified, “I’m not sure if it was right against [the shed] or not.” Transcript 124, lines 6-8; Exh. 5. He further agrees that the picture, taken at the time of its discovery, shows the narcotics were “abutting and under the shed.” Transcript 125, lines 10-18. Officer Crevier corroborates their location “alongside the patio/shed area.” Testimony of Officer Crevier, Transcript 134, lines 18-19.
Apartment 22 was not a modem, urban apartment building. The patio and shed of Apartment 22-D were solely for the tenant’s control and use. To the extent it was unclear in the previous memorandum of decision, the pile of leaves under which the first cache of narcotics was found was touching the attached shed. That shed, and the patio area of Apartment 22-D were areas of exclusive control for Apartment 22-D’s tenant.

B. Whether a Search, in the Constitutional Sense, Occurred

Next, the Commonwealth misapplies Commonwealth v. Montanez, 410 Mass. 290 (1991), claiming, yet again, that the patio and shed were common areas with no expectation of privacy. They argue there can never be a search, in the constitutional sense, for these areas because they are open to the public. In Montanez, the defendant had automatic standing, under Frazier, to contest whether narcotics found above the ceiling tiles of an urban apartment building’s common area amounted to a “search” in the constitutional sense. That court concluded that no one, including the defendant, could have any expectation of privacy in “a common area, accessible to the public, that was freely and frequently used by people other than the defendant,” and, accordingly, no search, in the constitutional sense, occurred. Montanez, 410 Mass at 301-03.
In this case, the police examined and investigated Apartment 22-D, finding and seizing narcotics from its cartilage. Apartment 22-D is a private dwelling within a six-unit building located in a fairly rural setting. Occupants have a reasonable expectation of privacy in their dwelling and its curtilage, and society recognizes that expectation as reasonable. Commonwealth v. Sanaa, 424 Mass. 92 (1997); Commonwealth v. Walker, 370 Mass. 548, cert. denied, 429 U.S. 943 (1976); Commonwealth v. Straw, 422 Mass. 756 (1996) (as to curtilage). The police conducted a search, in the constitutional sense, of Apartment 22-D and its cur-tilage.
C. Standing to Challenge the Search
“The Commonwealth may not have it both ways.” Commonwealth v. Amendola, 406 Mass. 592, 600 (1990). “We held, as a matter of State constitutional law, that ‘[w]hen a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and the seizure of that evidence.’ ” Commonwealth v. Frazier, 410 Mass. 235, 243 (1991), citing Amendola at 601. “ [Possession is an essential element of the trafficking charge . . . Therefore, [the defendant] has standing to challenge the search ... as it relates to the trafficking [charge]. ” Frazier at 245 (holding that a defendant, charged with cocaine trafficking, had automatic standing to challenge the search of his girlfriend’s handbag, which occurred outside of his presence, where cocaine was found).
The Commonwealth, eschewing Frazier, seeks to have this court apply Commonwealth v. Carter, 424 Mass. 409 (1997). In Carter, the defendant was visiting a friend in the first floor of an apartment when the police executed an arrest warrant. He fled the apartment and the police observed him hiding on a stranger’s second floor porch. The police later discovered the defendant’s wallet and narcotics on that second floor porch. Carter sought to have these items suppressed, contending that the second floor tenant’s right to privacy was available to him and, as such, he challenged the search as invading his own right to privacy. The Carter court found that the fleeing defendant unlawfully intruded on the stranger’s second floor porch to avoid apprehension. Under those circumstances, the court held, he could not establish his own independent expectation of privacy from that of the completely uninvolved stranger at a completely involved location where he had no right to be. Carter, 424 Mass, at 410, 412.
None of the Carter circumstances apply to this case. The defendant, Sinclair, is the sister of Apartment 22-D’s tenant. Her brother was certainly not a stranger. In fact, the police testified to familiarity with her and her presence at the apartment. Archer asserts he was an invited guest. The Commonwealth presented no evidence disputing this. At no time was either defendant fleeing from police, or observed to hide any items. Archer, in particular, searched in areas where the narcotics were not located, and did not search the area where they were hidden — behavior which indicated he did not hide them previously. Archer was never observed with any narcotics and the testimony was conflicting as to whether Archer or Nattoo (who was present at the apartment before the police and would have had both the motive and opportunity to hide any contraband before their arrival) told Sinclair narcotics were hidden at the apartment. Lastly, Apartment 22-D, where the narcotics were *509 found, was also the crime scene. Because this case differs from Carter, the defendants have “automatic standing to challenge the seizure of property in the possession of another at the time of the search, if the defendant[s] [have] been charged with the constructive possession of that property at that time ... in such a situation we have not required that the defendant show that he had a reasonable expectation of privacy in the area searched.” Carter, 424 Mass, at 411 (multiple internal citations omitted).

ORDER

For the reasons discussed above, the Commonwealth’s Motion for Reconsideration is hereby DENIED.