COMMONWEALTH *vs.* ALFONSO PRATER
(and a companion case[1]).

Essex. January 6, 2000. - March 22, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Practice, Criminal,* Admissions and confessions, Jury and jurors, Instructions to jury, Plea, Agreement between prosecutor and witness, Verdict. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Jury. *Evidence,* Admissions and confessions, Opinion, Consciousness of guilt, Flight, Intent. *Jury and Jurors. Felony-Murder Rule. Armed Assault with Intent to Rob. Malice. Intent.*

At the trial of an indictment for murder, the findings of the judge, to the effect that the defendant was not under the influence of marijuana when he made statements to police after his arrest, were supported by the record, and there was no error in the judge's denial of the defendant's motion to suppress those statements. [89-90]

A Superior Court judge acted within her discretion in declining to grant a hearing on a criminal defendant's motion to dismiss the jury venire as not representative of the African-American and Hispanic population of the county, where the defendant did not establish a prima facie case of unconstitutional jury selection by showing that the groups were underrepresented in the venire and that underrepresentation was due to systematic exclusion in the jury selection process. [90-93]

At the trial of a murder case, the erroneous admission of testimony of a witness, regarding her conclusion as to who was present at the scene of the shooting, based not on her observations at the time but on previous observations and subsequent conversations with others, was nonprejudicial, where it was clear that the witness's opinion was not the result of her firsthand knowledge. [93-94]

At the trial of a murder indictment on a theory of felony-murder, with armed assault with intent to rob as the underlying felony, the intent to rob served as the substitute for the malice requirement of murder and the defendants' motions for required findings of not guilty were correctly denied. [94-97]

At the trial of an indictment for murder in which there was ample evidence of the defendant's flight from police, the judge properly instructed the jury on flight as possible evidence of consciousness of guilt. [97]

At a murder trial, there was no error in the judge's instructions to the jury regarding the testimony of immunized and accomplice witnesses, in circumstances in which the prosecutor had not improperly vouched for such witnesses' veracity [97-98], and error, if any, in the judge's failure to

---

[1]Commonwealth *vs.* Jamie Spillane.

instruct the jury not to consider an accomplice's guilty plea as evidence against the defendant did not create a substantial risk of a miscarriage of justice, where the plea agreement was not in evidence [98-99].

At a murder trial, error, if any, in the judge's use of finding language with respect to the elements of the crime of assault did not create a substantial risk of a miscarriage of justice, considering the judge's instructions as a whole. [99]

Where, at the trial of an indictment for armed assault with intent to rob, sufficient evidence was introduced to support the defendant's conviction of the assault either by force and violence or by assault and placing the victim in fear of immediate bodily injury, there was no error in the form of the verdict slip which did not specify the alternative theories. [99-100]

INDICTMENTS found and returned in the Superior Court Department on March 6, 1996.

A pretrial motion to suppress evidence was heard by *Joseph A. Grasso, Jr.*, J., and the cases were tried before *Christine M. McEvoy*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James E. Methe* for Alfonso Prater.

*Robert L. Sheketoff* for Jamie Spillane.

*Catherine Langevin Semel*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendants, Alfonso Prater and Jamie Spillane, were convicted of murder in the second degree based on a theory of felony-murder.[2] On appeal, both defendants challenge the admissibility of testimony of a witness, the denial of each defendant's motion for a required finding of not guilty, and the jury instruction regarding the requisite intent for the crime of assault. Prater also challenges the denial of his motion to suppress, the judge's failure to conduct an evidentiary hearing before denying the motion to dismiss the jury venire, the jury instruction regarding consciousness of guilt, the failure to give requested instructions concerning witnesses who testify pursuant to grants of immunity or plea agreements, and the form of the verdict slips. We transferred the cases here on our own motion. We affirm the judgments.

1. *Facts.* A jury could have found the following. Shortly after midnight on February 6, 1996, the victim was shot as he was

---

[2]Alfonso Prater and Spillane were tried jointly with a third codefendant. The third codefendant is not before us on this appeal.

sitting in his automobile stopped momentarily outside a house in Lynn. After being shot, the victim drove his automobile away and crashed into a parked vehicle. An autopsy indicated that the victim died as a result of a gunshot wound to the chest which caused the victim to bleed to death.

Two days before the victim's murder, Ethel Jones, Prater's girl friend, paged the victim and asked him for a ride. Jones later told Prater that the victim had between two and three thousand dollars in cash.

The next afternoon, February 5, Prater devised a plan to rob the victim. As part of the plan, Jones paged the victim and asked him to give her a ride. After he picked her up, Jones asked the victim to give her a ride to Simwenyi Robinson's house.

In the meantime, Prater, Spillane, Stanley Pierrecanel, and Amaury Soriano met at Robinson's house.[3] They planned to rob the victim and to split the proceeds from the robbery evenly among the four of them. Prater had a gun when he arrived at Robinson's house.[4]

The victim drove Jones to Robinson's house. After she got out, Prater, Spillane, Pierrecanel, and Soriano surrounded the victim's automobile. Prater ordered the victim to get out of the automobile, but the victim refused. Prater held a gun in his hand, touching the victim's shoulder. The automobile then jerked forward and the gun fired. The victim drove his automobile away, but crashed into a parked vehicle.

Spillane, Pierrecanel, and Soriano ran to Pierrecanel's house. Spillane flushed the shells down the toilet. Prater and Jones went into Robinson's apartment. Prater told Jones and Robinson, "You don't know nothing."

The next morning, Jones, Prater, Spillane, Pierrecanel, and Soriano all learned through a newspaper article that the victim had died. After an investigation, arrest warrants were issued for Prater, Pierrecanel, and Spillane.

On February 14, the day after Prater's arrest warrant was issued, Lynn police Detective Peter Holey set up surveillance at

---

[3]Simwenyi Robinson was outside when the four arrived. Prater told Robinson to go inside.

[4]Stanley Pierrecanel told Spillane to take the bullets out of the gun before they arrived at Robinson's house.

Prater's mother's house.[5] Holey saw Prater leave the house on foot and pursued Prater in his vehicle. Prater ran to a vacant lot and then started to climb stairs at the back of an adjacent house. Holey called to Prater to stop. Prater looked back at Holey, but then continued running up the stairs. Holey continued to chase Prater and called for assistance. Subsequently, Prater was stopped and handcuffed. The police found a small bag of marijuana on Prater's person.

2. *Denial of the motion to suppress.* At booking the police recited the Miranda warnings to Prater and then readvised him before beginning to interview him. Approximately three hours after the interview began, Prater stated that he wished to discontinue it. The interview ended. Prater refused to sign any of the notes that were taken during the interview. Before trial, Prater moved to suppress his postarrest statement. The motion was denied after an evidentiary hearing.

Prater contends that he could not have voluntarily waived the Miranda warnings before the police interview because he was under the influence of marijuana. He argues that the motion judge's finding that Prater was not affected by marijuana should be reversed because it was clearly erroneous. See *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978). In addition, Prater notes that we have stated that "[t]his court must, where justice requires, substitute its judgment for that of a trial judge at the final stage." *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). We are not persuaded by Prater's arguments.

"In an appellate court's examination of a judge's determination that a defendant has validly waived his Miranda rights and voluntarily made statements to the police, the judge's subsidiary findings of fact supporting the determination will not be disturbed absent clear error. Moreover, . . . we accord substantial deference to the judge's ultimate findings" (citation omitted). *Commonwealth* v. *Dunn*, 407 Mass. 798, 804-805 (1990).

The motion judge's findings here are supported by the record. At the hearing, three officers who were with Prater at the time of his arrest and at the time he made his statement said that they did not detect the odor of marijuana on him. They further said that his speech and demeanor did not suggest that he was

[5]Detective Peter Holey knew Prater because Holey had coached Prater when he played high school football.

under the influence of drugs. Although Prater testified that he had smoked marijuana prior to his arrest, the motion judge was entitled to credit the testimony of the officers. *Commonwealth* v. *Dunn, supra* at 805. *Commonwealth* v. *Day,* 387 Mass. 915, 919 (1983). There was no error in the motion judge's denial of Prater's motion to suppress.

3. *Denial of the motion to dismiss jury venire.* Prater argues that the judge erred in denying him an evidentiary hearing on his motion to dismiss the jury venire, in violation of the Sixth. Amendment to the United States Constitution.[6] Prater contends that he made a sufficient showing to be entitled to a hearing to prove that systematic exclusion of minorities led to their under-representation in the jury venire. We disagree.

Before the trial began, Prater filed a motion to dismiss the jury venire.[7] Prater also filed a memorandum of law, with five attached exhibits. Exhibit A included selected pages from the 1990 census for Massachusetts pertaining to the minority population of each county. Exhibit B was a copy of an affidavit in support of Prater's motion to dismiss the jury venire by a Massachusetts criminal defense attorney. Exhibit C included copies of thirty-four affidavits from attorneys who served or had served as bar advocates in Essex County. All of these affidavits were signed in May or June, 1995. Exhibit D was an excerpt from a 1994 report by this court's Commission to Study Racial and Ethnic Bias in the Courts. The final exhibit, Exhibit E, was a newspaper article. In addition, defense counsel noted on the record, based on visual observations, that "there can be no more than [three] out of approximately [ninety] members of the venire . . . who appear to be either [H]ispanic or African American."[8]

---

[6]Prater "also relies on art. 12 of the Massachusetts Declaration of Rights as a basis for his motion to dismiss. We need not consider his claim under art. 12 separately, because he does not advance any suggestion that art. 12 might provide relief unavailable under the Sixth Amendment. We note, however, that the protections afforded by art. 12 are not necessarily coextensive with those afforded by the Sixth Amendment." *Commonwealth* v. *Tolentino,* 422 Mass. 515, 519 n.2 (1996).

[7]Codefendants Spillane and Pierrecanel filed motions to join Prater's motion. Both motions to join were allowed. On appeal, Spillane does not challenge the denial of the motion to dismiss the jury venire.

[8]The following day, before proceeding with empanelment, the judge noted

After reviewing these documents, the judge stated that Exhibits B and C were not properly before her because they were not original affidavits. Defense counsel conceded that Exhibit D did not contain any conclusions that related specifically to Essex county and that Exhibit E, a newspaper article, did not carry much weight. Defense counsel requested an evidentiary hearing to put on the testimony of the jury commissioner, the city clerk for the city of Lynn, and the city clerk for the city of Lawrence. The judge concluded that defense counsel did not make an adequate showing under *Commonwealth* v. *Tolentino*, 422 Mass. 515 (1996), to order an evidentiary hearing on the issue of systematic exclusion. There was no error.

A judge has discretion in determining whether to grant an evidentiary hearing on a motion to dismiss a jury venire. See *Commonwealth* v. *Rodwell*, 394 Mass. 694, 698-699 (1985) (judge acted within his discretion in deciding motion to suppress without evidentiary hearing where affidavit presented no significant facts in support of defendant's claim); *Commonwealth* v. *Pope*, 392 Mass. 493, 500-501 (1984) (judge acted within his discretion in denying motion to dismiss jury venire).

In order to "establish a prima facie case of unconstitutional jury selection under the Sixth Amendment, the defendant was required to demonstrate that '(1) the group allegedly discriminated against is a "distinctive" group in the community, (2) that the group is not fairly and reasonably represented in the venires in relation to its proportion of the community, and (3) that underrepresentation is due to systematic exclusion of the group in the jury selection process.' " (Footnote omitted.) *Commonwealth* v. *Tolentino, supra* at 518-519, citing *Commonwealth* v. *Bastarache*, 382 Mass. 86, 96-97 (1980).

At the outset, we note that much of the evidence Prater relied on was not properly before the judge. Exhibits B and C were improperly before the court because they were copies, not original affidavits. In addition, neither Exhibit D nor Exhibit E was competent evidence. *Commonwealth* v. *Pope, supra* at 500 ("Evidence which [the defendant] offered in support of these

that, based on visual observations, approximately five of the ninety-one jurors were "either [H]ispanic or black or [A]sian."

claims included several newspaper articles and an excerpt from a study which discussed aspects of juror selection and the percentages of certain minority groups on jury panels in Worcester County, or in other unrelated urban areas. Such hearsay evidence is not competent to demonstrate the illegality of the jury selection system"). Finally, we note "that visual observations alone are not a reliable guide to the true makeup of a jury venire." *Commonwealth* v. *Tolentino, supra* at 520. See *Commonwealth* v. *Fryar*, 425 Mass. 237, 242, cert. denied, 522 U.S. 1033 (1997), and cases cited. Here, there is no dispute that the first requirement (i.e., a distinctive group in the community) was satisfied. However, Prater failed to make a prima facie case of either underrepresentation or systematic exclusion.

Even assuming, arguendo, the admissibility of the evidence, Prater did not demonstrate the underrepresentation of a distinctive group. "A criminal defendant is not constitutionally entitled to a proportionate number of his race on the jury venire. . . . The majority of courts have looked to the absolute disparity test to determine whether underrepresentation of a group is substantial. . . . In order to calculate the absolute disparity between a group's representation in the population and its representation in the jury venire one simply subtracts the latter percentage from the former. . . . The courts that have adopted the absolute disparity measure have ruled that a less than ten percentage point disparity can never be substantial" (citations and footnote omitted). *Commonwealth* v. *Fryar, supra* at 242-243. Here, even using Prater's most promising data, the disparity is less than ten percentage points.[9] "Although the venire contained a smaller proportion of [b]lacks and Hispanics than found in the community, we conclude that the venire passed the constitutional requirement for minority representation." *Commonwealth* v. *Fryar, supra* at 243.

In addition, Prater did not produce any evidence pertaining to the issue of systematic exclusion. He claims that defense counsel needed an evidentiary hearing to prove systematic exclusion. "For [Prater] to establish a prima facie case of an unconstitu-

___

[9]Using 1990 census figures, Prater claims that approximately eleven per cent of the population of Essex County is comprised of people who are either black, Hispanic, or Asian. He contends that either two (2.2%) or three (3.3%) of the ninety-one jurors were members of these races. Subtracting either 2.2% or 3.3% from 11% yields 8.8% or 7.7%. Neither of these percentages is high enough to demonstrate substantial underrepresentation using the absolute disparity test.

tional . . . jury selection procedure, he should have presented evidence showing that, during the time [of his trial], a nonrandom selection procedure was operating in [Essex] County, which procedure resulted in a systematic, disproportionate underrepresentation of his protected class in the . . . jury venires." *Commonwealth* v. *Pope, supra* at 499. See *Commonwealth* v. *Peters,* 372 Mass. 319, 323 (1977), and cases cited. Cf. *Commonwealth* v. *Aponte,* 391 Mass. 494, 508-509 (1984). Prater has not made any showing on this issue. Thus, the judge was within her discretion in refusing to grant an evidentiary hearing. In sum, Prater did not make an adequate showing of underrepresentation or even a minimal showing of systematic exclusion. There was no error in the denial of an evidentiary hearing.

4. *Admission of testimony.* Both Prater and Spillane argue that the judge erred by permitting the prosecutor to elicit testimony from Jones that Spillane was present at the scene of the shooting. During the first afternoon that Jones testified, she stated that she could not recognize the person on the passenger's side of the car. She further testified that she could not tell whether the person was a male or a female. When Jones testified the following morning, the prosecutor asked whether she could tell the jury who were the four people around the car. Although Spillane's defense counsel objected, Jones was permitted to answer the question. On cross-examination by Spillane's defense counsel, the witness conceded that she did not see Spillane at the scene of the shooting.

Through a series of questions on redirect, the witness clarified that, although she could not identify people based solely on what she had seen on the night of the crime, she was able to determine who was around the car based on previous observations she made and subsequent conversations she heard. In a sidebar conference held prior to this redirect questioning, the prosecutor revealed that Jones obtained her information from Prater and Soriano. The judge then told the prosecutor that the witness would be permitted to testify that she was able to reach her conclusions after hearing conversations, but that she would not be permitted to name the speakers. After Prater's defense counsel objected to this anticipated questioning and testimony, the judge stated that the testimony was admissible. She explained that she was forbidding the witness to disclose the

speakers so as to avoid a *Bruton*[10] hearing, but that she would hold such a hearing if necessary. None of the defense counsel continued to press an objection.

On appeal, Prater and Spillane complain that this testimony is inadmissible opinion testimony. They argue that there is no valid basis for the admission of the witness's conclusions regarding the identities and positions of the people around the car. They state that admission of this evidence was highly prejudicial. We agree that it was error to admit this testimony. We conclude that the error was nonprejudicial.

Although "[o]pinions concerning who the perpetrator of a crime was . . . are normally irrelevant in a criminal trial," *Commonwealth* v. *Lennon*, 399 Mass. 443, 445 (1987), the admission of this evidence was not prejudicial. An error is nonprejudicial "[i]f . . . the conviction is sure that the error did not influence the jury, or had but very slight effect" (citations omitted). *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). Here, the witness's testimony was not the only evidence proffered against the defendants. Contrast *Commonwealth* v. *Riccard*, 410 Mass. 718, 722-723 (1991) (prejudicial error where improper testimony was "the *only* evidence clearly identifying the defendant as the one 'that did it' ''); *Commonwealth* v. *Daye*, 393 Mass. 55, 65 (1984) (harmful error where only one witness identified defendant in court as perpetrator).

The jury knew that Jones's testimony was based on her prior observations combined with knowledge she gained through subsequent conversations. They knew that she was not basing her testimony on what she had actually seen the night of the murder. See *Commonwealth* v. *Lennon*, *supra* at 446 ("[i]t was clear that [the witness's] opinion was not the result of personal or first-hand knowledge of what had happened earlier"). Further, the witness here had a basis from which to make inferences. Contrast *Commonwealth* v. *Martin*, 417 Mass. 187, 190 (1994) (witness's testimony based solely on her "instinct or suspicion"). The evidence erroneously admitted was not prejudicial.

5. *Denial of the motions for a required finding of not guilty.* Prater and Spillane complain that the judge committed error in denying their motions for required findings of not guilty. They argue that no rational trier of fact could have found beyond a reasonable doubt that the underlying felony, armed assault with

---

[10]*Bruton* v. *United States*, 391 U.S. 123 (1968).

intent to rob, was "independent" of the homicide. They also contend that, assuming the motions were properly denied, the jury should have decided whether the crimes were independent. These arguments have no merit.

We begin with a review of some basic considerations of the common-law felony-murder rule. "The felony-murder rule as it was formulated in England was a doctrine of constructive malice. To make out a case of murder it was necessary only to establish that the defendant had committed a homicide while engaged in the commission of a felony. No other evidence had to be introduced to prove the essential element of malice aforethought. . . . This was the only function which the rule performed; it obviated the necessity of establishing malice aforethought by other means" (citations omitted). *Commonwealth* v. *Balliro*, 349 Mass. 505, 512 (1965). However, under the common law, "[n]o person can be held guilty of a homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by some one acting in concert with him or in furtherance of a common object or purpose." *Id.* at 513, quoting *Commonwealth* v. *Campbell*, 7 Allen 541, 544-546 (1863). In sum, the felony-murder rule, originally formulated in England, has been developed by case law to "impose[] criminal liability for homicide on all participants in a certain common criminal enterprise if a death occurred in the course of that enterprise." *Commonwealth* v. *Watkins*, 375 Mass. 472, 486 (1978). "[T]he felony-murder rule is based on the theory that the intent to commit the felony is equivalent to the malice aforethought required for murder." *Commonwealth* v. *Matchett*, 386 Mass. 492, 507 (1982).

Prior to *Matchett*, a defendant could be found guilty of murder on a theory of felony-murder if he or she committed a homicide while engaged in the commission or attempted commission of a felony punishable by life in prison. See, e.g., *Commonwealth* v. *Devlin*, 335 Mass. 555, 567 (1957). In *Matchett*, we narrowed the scope of the felony-murder rule by requiring that, to convict of murder under the felony-murder rule, the underlying felony must be either inherently dangerous to human life or committed with a conscious disregard of the risk to human life. See *Commonwealth* v. *Ortiz*, 408 Mass. 463, 466 (1990); *Commonwealth* v. *Carter*, 396 Mass. 234, 234-235 (1985); *Commonwealth* v. *Moran*, 387 Mass. 644, 648-651

(1982). Our subsequent cases are consistent with these principles.

In *Commonwealth* v. *Claudio*, 418 Mass. 103, 108-109 (1994), we said, "[a]s a general principle, our cases treat those felonies involving the use of a deadly weapon, such as a knife or a loaded gun, as inherently dangerous to human life. See *Commonwealth* v. *Currie*, 388 Mass. 776, 785 (1983); *Commonwealth* v. *Watson*, 388 Mass. [536], 544 (1983). Imposition of liability under the felony-murder rule, when a homicide occurs in the commission of an offense while armed, is justified because a defendant's willingness to use a weapon demonstrates a conscious disregard for human life, see *Commonwealth* v. *Watson*, *supra* at 543, or malice."

Relying on *Commonwealth* v. *Gunter*, 427 Mass. 259 (1998), the defendants argue that the court cannot conclude that the underlying felony here was independent of the homicide. We do not agree. In *Commonwealth* v. *Wade*, 428 Mass. 147 (1998), we said that, "if the felony-murder rule relieves the prosecution of proving malice, the 'substitute intent derived from the felony should be clearly distinct from malice and not merely a mental state that is less culpable than malice but is similarly related to or inferred from the act of violence resulting in homicide.' " *Id.* at 152, quoting *Commonwealth* v. *Gunter*, *supra* at 272.

In *Wade*, the underlying felony for the murder conviction was aggravated rape. We explained that "the intent to commit the rape . . . is the substitute for the malice requirement of murder, and the intent to commit the rape, not the intent to inflict serious bodily harm, was the substitute for the malice requirement of murder." *Commonwealth* v. *Wade*, *supra* at 153. "It is the intent to do that conduct . . . that serves as the substitute for the malice requirement of murder." *Commonwealth* v. *Christian*, 430 Mass. 552, 556 (2000). *Gunter* is in accord with the principles governing the application of the felony-murder rule.

Here, the intent to rob serves as the substitute for the malice requirement of murder. Because the underlying felony of armed assault with intent to rob is equivalent to the malice aforethought required for murder, imposition of liability under the felony-murder rule is justified. The defendants also argue that the underlying felony could not support a conviction of felony-murder simply because a single assault resulted in the victim's death. We disagree. The focus of the analysis is on the substitu-

tion of the intent, not on the number of assaults. *Commonwealth v. Christian, supra* at 556 n.3. See *Commonwealth v. Claudio, supra* at 108; *Commonwealth v. Matchett, supra* at 506. There is no error in the application of the felony-murder rule to the defendants.

6. (a) *Instructions regarding consciousness of guilt.* On appeal, Prater argues that the judge erred in instructing the jury that they could infer consciousness of guilt from Prater's flight from the police. Prater contends that there was not sufficient evidence in the record to support this instruction. See *Commonwealth v. Carita,* 356 Mass. 132, 140 (1969). At trial, he offered other reasons to explain his flight. Prater's counsel objected to this instruction at trial. There was no error.

It is proper for a judge to instruct on flight as possible evidence of consciousness of guilt. *Commonwealth v. Carrion,* 407 Mass. 263, 277 (1990). Here, there was ample evidence of Prater's flight from the police. Prater concedes that he ran from the police, but argues that this action does not support an inference of consciousness of guilt. When there are multiple possible explanations for a defendant's flight, it is for the jury to decide if the defendant's actions resulted from consciousness of guilt or some other reason. *Commonwealth v. Booker,* 386 Mass. 466, 470-471 (1982). The judge acted within her discretion in deciding to give an instruction on consciousness of guilt over the defendant's objection. *Commonwealth v. Claudio, supra* at 119.

(b) *Instruction regarding testimony of immunized or accomplice witnesses.* Relying primarily on *Commonwealth v. Ciampa,* 406 Mass. 257, 263 (1989), Prater argues that the judge erred in declining to instruct the jury that the Commonwealth cannot vouch for the veracity of witnesses who are testifying in accordance with a plea agreement or pursuant to a grant of immunity.[11] Defense counsel did not object when the instruction was not given. We conclude that the issue was preserved because defense counsel requested the instruction at the charge conference following the close of evidence. *Commonwealth v. Biancardi,* 421 Mass. 251, 253-254 (1995). Thus, we consider whether the judge committed error and, if so, whether the error was prejudicial. *Commonwealth v. Alphas,* 430 Mass. 8, 13-14 n.7 (1999). There was no prejudicial error.

[11]Ethel Jones testified as part of her plea agreement and Amaury Soriano testified in exchange for a grant of immunity. Prater does not argue that the prosecutor impermissibly vouched for the truthfulness of either witness.

Prater's reliance on *Ciampa* is misplaced. In *Ciampa*, the prejudicial admission of certain portions of a written plea agreement was not cured by the judge's charge. *Commonwealth* v. *Ciampa, supra* at 262-263. The Commonwealth, arguably, vouched for the truthfulness of a witness. *Commonwealth* v. *Ciampa, supra* at 262. See *Commonwealth* v. *Meuse*, 423 Mass. 831, 832 (1996) (prosecutor suggested that witness testifying pursuant to plea agreement was truthful).

Here, as Prater concedes, the prosecutor did not vouch for either witness's veracity. Further, the judge provided an instruction regarding the testimony of immunized and accomplice witnesses, although not required to do so.[12] *Commonwealth* v. *Daye*, 411 Mass. 719, 739 (1992), and cases cited. There is no prejudicial error.

Prater also argues that the judge should have instructed the jury not to consider an accomplice's guilty plea as evidence against Prater.[13] The witness testified that she had made an agreement with the government in exchange for her testimony, but the plea agreement itself was not admitted in evidence. Defense counsel did not object at trial.

The better practice would have been for the judge to have provided a specific instruction that the jury should not consider an accomplice's guilty plea as evidence against Prater. See *Commonwealth* v. *Ciampa, supra* at 266, citing *United States* v. *Mealy*, 851 F.2d 890, 900 (7th Cir. 1988) ("[witness's] guilty plea is not to be considered as evidence against the defendants"). Assuming, without deciding, that this omission constituted error, we consider whether the error created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Alphas, supra* at 13. The plea agreement was not admitted in evidence, but only marked for identification. The judge instructed the jury that

[12]With respect to testimony of immunized and accomplice witnesses, the judge instructed, "[t]hat testimony should be examined with caution and great care. You should consider whether the testimony of these witnesses may be colored in such a way as to further the witness' own interest, including in that consideration, the evidence of any plea agreement which may have been entered into. You may consider any future benefits that a witness who has entered into a plea agreement may expect in the future as a benefit from the [g]overnment in evaluating that witness' case. After careful consideration you may give the testimony of accomplices and immunized witnesses such weight as you feel it deserves."

[13]Prater acknowledges that Jones's plea agreement was not introduced in evidence.

items marked only for identification cannot be considered as evidence. There was no substantial risk of a miscarriage of justice.

(c) *Instruction regarding proof of the defendants' intent to injure.* Prater and Spillane contend that the judge committed error when she stated to the jury, "[i]f you find that [the victim] actually suffered bodily harm at the hand of the defendant, or at the action of the defendant, [the Commonwealth has proved assault]." The defendants did not object at the end of the instruction. Prater and Spillane now claim that this sentence of the instruction violated their due process rights because it undermined the fact finder's responsibility to determine intent. Because the judge used finding language, the defendants claim constitutional error. See *Connolly* v. *Commonwealth*, 377 Mass. 527, 533-534 (1979). We assume, without deciding, that the finding language is erroneous.

Before making the statement containing the finding language, the judge correctly stated, "An assault may be committed in one of two ways. First, assault is defined as an attempt or offer by one person to do bodily injury to another by force or violence. Alternatively, an assault consists of putting a person in fear of immediate bodily injury. The first type of assault consists of an offer or attempt to commit a battery. In this type of assault the Commonwealth must prove beyond a reasonable doubt that the defendant . . . intended to physically harm [the victim]. In other words, the Commonwealth must show that the defendant did in fact attempt to do bodily harm to [the victim]." Thereafter, in the instructions, the judge repeatedly placed the burden of proving each essential element of each crime against each defendant on the Commonwealth.

"Taken as a whole . . . the [isolated statement] did not create a substantial [risk] of a miscarriage of justice." *Commonwealth* v. *Kosilek*, 423 Mass. 449, 454 (1996). See *Commonwealth* v. *Painten*, 429 Mass. 536, 547 (1999).

7. *Verdict slip.* Prater argues that the verdict slip for the indictment charging armed assault with intent to rob was incorrect. He did not object to the form of the verdict slip at trial. The judge instructed the jury that the assault could be committed in either of two ways: either by force and violence or by assault and placing the victim in fear of immediate bodily injury. She also instructed the jurors that they must be unanimous as to the theory underlying the armed assault to rob. The verdict

slips, however, did not list these alternative theories. Prater contends that there was insufficient evidence to support a conviction of assault under the second theory (armed assault and placing in fear) because the victim could not see the gun. Thus, he concludes that the murder conviction must be vacated and the case remanded for a new trial because the jury may have relied on that theory. We do not agree.

There was adequate evidence for the jury to have convicted the defendants under either theory. The victim's car was surrounded by the two defendants and two others. Prater placed the gun on the victim's shoulder and the car jerked forward. From that evidence, the jury could conclude that the armed assault with intent to rob was committed by force and violence or by placing the victim in fear of immediate bodily injury or both. There was more than enough evidence to prove armed assault to rob.

*Judgments affirmed.*