# United States Court of Appeals
## For the First Circuit

---

No. 01-1971

LOUIS E. MELLO,

Petitioner, Appellant,

v.

PAUL DIPAULO, SUPERINTENDENT, et al.

Respondents, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Wendy Sibbison for appellant.

Dean A. Mazzone, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellees.

---

July 10, 2002

---

**LIPEZ, <u>Circuit Judge</u>**.  A Massachusetts Superior Court jury convicted eighteen-year-old Louis Mello of first degree murder and other crimes in connection with a fire in an apartment building which he admits he started to settle a score with Leonard Starcher, who died in the blaze.  Mello appeals from the district court's denial of his petition for habeas corpus relief under 28 U.S.C. § 2254, continuing his challenge to his first degree murder conviction on the ground that his trial counsel rendered ineffective assistance.  Because the state court decision affirming his conviction was neither contrary to, nor an unreasonable application of, clearly established federal law, we affirm.

## I. Background

At approximately 4:30 a.m. on July 19, 1987, fire engulfed a six-unit apartment building in Fall River, Massachusetts, killing two of the residents, Leonard Starcher and Edward Walsh.  The cause of the fire was a "molotov cocktail" thrown at the porch in front of the building.  Later that day, Louis Mello confessed to his participation in starting the fire.

At trial, Mello offered the defense that, while he intended to set Starcher's building on fire, he was too intoxicated to understand that burning the building might result in the death of the people inside it, and therefore he should not have been convicted of first degree murder on a theory of deliberation and premeditation.  Starcher's apartment had been a gathering place for a group of young people, including Mello, Domingos Arruda, and Nelson Tavares.  Mello had been paying daily visits to Starcher's

-2-

apartment for much of the preceding year, arriving in the late morning and staying until midnight or later.  On a typical day, Mello would drink "about a case of beer" at Starcher's place.  The day before the fire, Mello had drunk a case of beer there.  That evening he inhaled three and a half $25 bags of heroin.  After taking the heroin, Mello became ill.  He testified that he "was vomiting" and "was very sick that night," and that he "didn't know what was going on."  Mello's girlfriend at the time, Michelle Boudria, who was with Mello around 11:45 p.m. on the night of the fire, testified that he "appear[ed] high."[1]

Three or four days before the fire, police had searched Mello's home for drugs, resulting in the arrest of Mello, his mother and her boyfriend.  Mello subsequently said to Boudria that "whoever ratted on him, his house getting raided, they're going to pay for what they did."  The night of the fire, Arruda told Mello that it was Starcher who had "ratted" on him, and suggested that they set fire to Starcher's apartment building.

Although Mello lived approximately 80 feet from Starcher, he returned home to get his mother's car to facilitate a "quick getaway" after starting the fire.  He snuck in and out of his house to get the car keys without awakening his mother.  Once he had the car, he picked up Arruda and Tavares and drove around the neighborhood (Mello recalled the precise sequence of streets in his testimony at trial).  Mello then parked the car, and Arruda went to

---

[1]    Mello was also a regular user of cocaine during this period, although there was no evidence that he used cocaine the night of the fire.

a gas station and returned with a can of gasoline.  Arruda poured the gasoline into a glass bottle, and Mello inserted a rag to serve as a wick.  Mello lit the rag, and Arruda threw the bottle into the cement underneath the wooden porch at the front of Starcher's building.[2]  Mello testified that the bottle was directed at the cement part of the porch to ensure that it would explode.

In addition to the porch, Mello's car caught fire.  Mello tried to extinguish the car fire with his feet, and he, Arruda and Tavares got back into the car and drove off.  He stopped at a dumpster to discard his blackened sneakers and drove home.  He said to Arruda and Tavares: "You guys don't know me and I don't know you."  Mello then went home and slept.  When a police officer arrived at the scene of the fire, all three stories on the west side of the apartment building were engulfed in flames.

The next morning, before he was arrested, Mello said to a police officer that he "couldn't believe [Starcher] was dead," and told Starcher's widow that "he was sorry about [her] husband."  When he confessed to the police later that day, he stated that, although he had intended to start the fire, "he never wanted to kill anybody in the house."[3]  After his initial confession to police, Mello "cried for a little while."  At trial, Mello's

---

[2]  Mello testified at trial that Arruda threw the bottle; in his statements to the police he had said that he threw the bottle himself.

[3]  In his written statement Mello said: "I didn't mean to kill him or anybody in that house."

attorney asked, "Did you intend to kill anybody?"  Mello replied: "No, I didn't."

However, there was evidence tending to show that Mello was not in a state of extreme intoxication the night of the fire. Mello succeeded in executing the series of steps required to start the fire, and recounted his actions in some detail at trial.  When asked about the effect of the heroin on Mello, Boudria said simply: "He was kind of tired."  Although Boudria indicated that Mello "appear[ed] high," she also said he was not having any trouble walking.  The morning after the fire, Mello did not appear intoxicated to the police.

Mello was found guilty of first degree murder for the death of Starcher on a theory of deliberation and premeditation, second degree murder for the death of Walsh, arson, and throwing an explosive device.  He received sentences of life imprisonment without parole on the first degree murder count, life imprisonment on the second degree murder count, and fifteen to twenty years on the arson count.

Mello then moved for a new trial or for a reduction of his first degree murder conviction to second degree murder.  Mello argued that his defense attorney had been ineffective in failing to investigate the use of expert testimony to support his mens rea defense to first degree murder and in failing to object to certain jury instructions on mens rea.  In 1992, the trial court held an evidentiary hearing at which a specialist in addiction medicine testified that Mello suffered from "cognitive impairment" that

prevented him from understanding that burning down Starcher's home in the middle of the night could have fatal consequences for Starcher. Unimpressed with this theory, the trial court denied Mello's motion. Mello appealed his convictions and the denial of his post-trial motions to the Supreme Judicial Court of Massachusetts (SJC). The SJC affirmed Mello's murder convictions and the denial of his post-trial motion.[4]

In 1996 Mello petitioned the federal district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing primarily that the ineffectiveness of his counsel deprived him of his Sixth Amendment right to counsel. In 2001 the district court denied the petition. Mello filed a timely notice of appeal, and the district court granted a certificate of appealability.

## II. Ineffective Assistance of Counsel

### A. The Sixth Amendment and the Habeas Standard

To demonstrate ineffective assistance of counsel in violation of the Sixth Amendment, Mello must establish (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); see also Scarpa v. DuBois, 38 F.3d 1, 8 (1st Cir.

---

[4] The SJC vacated the arson conviction as duplicative of the second degree murder conviction because the jury could have based the second degree murder conviction on a felony-murder theory, with arson as the underlying felony.

1994).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.

To prevail on his habeas petition, however, Mello must demonstrate not just that the Strickland standard for ineffective assistance of counsel was met, but also that the SJC's adjudication of his constitutional claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result," id. at 406.  A state court decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

The Supreme Court has made clear that "an unreasonable application of federal law is different from an incorrect application of federal law."  Id. at 410.  Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

-7-

incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Hurtado v. Tucker, 245 F.3d 7, 15-16 (1st Cir. 2001).

## B. The SJC's Opinion

Mello raised both federal and state ineffective assistance of counsel claims before the SJC. In evaluating his arguments, the SJC applied a state-law standard for ineffective assistance of counsel; it did not expressly rule on Mello's federal ineffective assistance claims. However, Massachusetts law and our own precedents make clear that the standard the SJC applied is at least as favorable to Mello as the federal standard.

### 1. The Claims Reviewed by the SJC

Because of the many claims raised in this case, both before the SJC and here, we find it necessary for purposes of clarity to categorize the claims under consideration.[5]

Some of Mello's claims were advanced before the SJC as state-law grounds for vacating the conviction independent of any claim of ineffective assistance of counsel. These claims include Mello's challenges to the prosecutor's closing argument, the jury instructions, and the alleged atmosphere of levity in the courtroom, none of which were objected to at trial by defense counsel. We label these "claims of error unobjected-to by counsel." Mello does not pursue these independent state-law claims in his habeas petition.

---

[5] In describing the SJC's opinion we omit certain claims that are no longer at issue on this appeal.

Mello advanced other claims before the SJC only under the rubric of ineffective assistance of counsel. This category includes Mello's claims that trial counsel was ineffective in failing to pursue expert testimony on his mental condition, to investigate his psychiatric history, and to exercise peremptory challenges. These claims we label "pure ineffective assistance of counsel" because they were argued only as ineffective assistance of counsel claims.

Finally, Mello advanced certain claims before the SJC both as independent grounds for relief and as a basis for a finding of ineffective assistance of counsel. This category contains Mello's claims of error by the prosecutor and the trial judge unobjected-to by trial counsel, and refashioned, because of counsel's failure to object, as ineffective assistance of counsel claims: trial counsel's failure to object to the prosecutor's closing arguments, to the jury instructions, and to the atmosphere of levity during the trial. These we denote as "hybrid" claims because they were argued both as independent grounds for relief and as an ineffective assistance of counsel ground for relief.

## 2. Standards Applied by the SJC to the Ineffective Assistance of Counsel Claims

In reviewing Mello's ineffective assistance of counsel claims, the SJC first cited the standard established in Commonwealth v. Saferian, 315 N.E.2d 878, 883 (Mass. 1974), which inquires "whether there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel

-9-

falling measurably below that which might be expected from an ordinary fallible lawyer -- and, if that is found, then, typically, whether it has deprived the defendant of an otherwise available, substantial ground of defen[s]e."  Although the SJC did not cite Strickland for the ineffective assistance of counsel standard, we have described the Saferian standard as "functionally identical to the federal standard."  Scarpa, 38 F.3d at 7 n.4; see Ouber v. Guarino,  No. 01-2390, 2002 WL 1290413 at *17 (1st Cir. June 17, 2002) (noting that "the Saferian standard is roughly equivalent to the Strickland standard"); Strickland, 466 U.S. at 688, 694 (requiring (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

The SJC then said that in reviewing "a conviction of murder in the first degree, regardless of whether a claim of ineffective assistance of counsel has been made," the question for the court is "whether, because of an [alleged] error by defense counsel, the prosecutor, or the judge, or for any other reason, there is a substantial likelihood of a miscarriage of justice unless relief is given." Commonwealth v. Johnson, 711 N.E.2d 578, 585 (Mass. 1999) (alteration in original); see also Commonwealth v. Painten, 709 N.E.2d 423, 433 (Mass. 1999) (same); Commonwealth v. Koonce, 636 N.E.2d 1305, 1309-10 (Mass. 1994) (same); Commonwealth v. Plant, 634 N.E.2d 896, 901 (Mass. 1994) (same).  The SJC has explained that the "substantial likelihood of a miscarriage of

-10-

justice" standard is "more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel."[6]  Commonwealth v. Wright, 584 N.E.2d 621, 624 (Mass. 1992).  Thus, if the SJC found that the "substantial likelihood of a miscarriage of justice" standard was not met, it must have concluded that the Saferian / Strickland standard for ineffective assistance of counsel was not met as well.[7]

In ruling on Mello's "pure" ineffective assistance of counsel claims, the SJC expressly applied the "substantial likelihood of a miscarriage of justice" standard (except in the case of the failure to exercise peremptory challenges, where the SJC concluded that counsel had made no error).  In deciding Mello's "hybrid" ineffective assistance claims, the SJC simply wrote: "[b]ecause we have previously disposed of the claims of prejudice arising from the prosecutor's closing argument, the judge's remarks, [and] the jury instructions . . . we need not repeat that analysis here."  Mello, 649 N.E.2d at 1118.  The SJC was referring back to its discussion of Mello's direct challenges to these alleged prosecutorial and judicial errors, where it had rejected

---

[6]  It is not clear whether the SJC is referring to the federal or the state "constitutional standard," but since the two standards are equivalent this ambiguity is insignificant.

[7]  The SJC also advanced a different formulation of the standard it applies to ineffective assistance of counsel claims in first degree murder cases, requiring that "there was an error . . . (by defense counsel, the prosecutor, or the judge) and . . . that error was likely to have influenced the jury's conclusion."  Mello, 649 N.E.2d at 1118 (internal quotation marks omitted).  The SJC seems to treat the "substantial likelihood of a miscarriage of justice" standard and this standard as equivalents.

-11-

Mello's claims under the same "substantial likelihood of a miscarriage of justice" standard. In other words, the SJC relied on the same "substantial likelihood of a miscarriage of justice" standard in rejecting Mello's "hybrid" ineffective assistance claims that it applied in analyzing his "pure" ineffective assistance claims.

In sum, the SJC rejected Mello's ineffective assistance of counsel claims under a "substantial likelihood of a miscarriage of justice" standard that the SJC says is more favorable to a defendant than the Saferian standard, which we have said is the functional equivalent of the Strickland standard. We therefore conclude that the SJC applied a standard of ineffective assistance of counsel that is at least as favorable to Mello as the federal standard.

## C. The District Court Opinion

The district court denied Mello's petition for habeas corpus relief. In so doing, it analyzed Mello's various ineffective assistance of counsel claims and concluded that the SJC's analysis of those claims was neither contrary to, nor an unreasonable application of, clearly established federal law. We review the district court's decision de novo. Nadeau v. Matesanz, 289 F.3d 13, 15 (1st Cir. 2002).

-12-

**D. The Specific Claims**

### 1. "Pure" Ineffective Assistance of Counsel

**a. Failure to Pursue Expert Testimony on Mello's Mental Condition**

Mello argues that his trial counsel was ineffective in failing to pursue expert testimony "on the combined effect of voluntary intoxication and [Mello's alleged] mental deficiencies" to bolster his mens rea defense to the first degree murder charge. In support of his motion for a new trial or for a reduction of his first degree murder conviction to second degree murder, Mello offered the testimony of Dr. Milton Burglass, a specialist in addiction medicine then affiliated with Harvard Medical School. Dr. Burglass had conducted "an in-depth substance abuse oriented neuropsychiatric examination" of Mello, interviewed his mother, reviewed Mello's school, juvenile court, and medical records, and read his trial testimony. Dr. Burglass stated that Mello had "a documented history of polysubstance abuse dating to the age of thirteen," and that at the time of the fire he met certain criteria for alcohol and cocaine dependence. He also indicated that Mello had "a childhood and early adolescent medical history compatible with minimal brain dysfunction" or "attention deficit disorder," and a "childhood and adolescent history of multiform psychiatric disturbances characterized by depression, anxiety, impulsivity, and suicidal ideation and acts." In addition, Dr. Burglass noted "a history of multiple head injuries from falls during early, middle, and late childhood and from beatings by his father."

Dr. Burglass expressed the opinion that these background factors, in conjunction with Mello's extensive use of alcohol and drugs during the day and evening before the fire, "impair[ed] substantially and significantly Louis Mello's conscious ability (a) to have perceived accurately; (b) to have correctly made attributions of cause and effect; and (c) to have appreciated and evaluated the outcome probabilities and consequences of the act of causing . . . a lighted bottle of gasoline to be thrown at the dwelling in which Leonard Starcher and others were sleeping." Although "[t]his cognitive impairment would not have precluded [Mello's] understanding the more proximal, or immediate, consequences that might arise from [his] act" -- the outbreak of fire in the building -- it "would have compromised his ability to appreciate and evaluate the nature, likelihood, and severity of more distal consequences," such as the fire causing the death of the people inside the building. Dr. Burglass declared that, "[w]ithin reasonable medical certainty, the clinical evidence does not support the conclusion that Louis Mello at any time formed the specific intent . . . to kill [or injure] Leonard Starcher or anyone else . . . as a result of an act of arson."

Mello argued to the SJC that trial counsel was ineffective in failing even to investigate the potential use of an expert such as Dr. Burglass to support his mens rea defense to first degree murder. Taking no position on the question of the adequacy of trial counsel's performance, the SJC rejected Mello's ineffective assistance claim on the ground that it was

-14-

"unpersuaded . . . that counsel's decision not to introduce expert testimony . . . was likely to have influenced the jury's verdict." Mello, 649 N.E. 2d at 1119. The SJC explained:

> despite his ingestion of alcohol and heroin the night of the killing, there was substantial evidence that [Mello] was capable of possessing, and did, in fact, possess the requisite intent [for first degree murder]. [Mello] was able to recall with specific detail the events of the crime. He appeared to have no trouble walking, and spoke coherently several hours before the fire. [Mello's] testimony revealed that on the night of the fire he had the composure to quietly slip out of his house, drive a car, and construct a molotov cocktail. Moreover, [Mello] had the presence of mind to appreciate the need for a "quick get-away," and to tell his friends after fleeing the scene, "You guys don't know me and I don't know you." Finally, [Mello] admitted that he had set the fire, and that he had been aware that people were in the apartment building while it was being torched. In short, the evidence clearly demonstrated that [Mello] was not so overcome by intoxicants as to be incapable of murder in the first degree.

Id.

We agree with Mello that "[a] confessed teenaged arsonist's denial of any intent to kill was a thin reed on which to structure a defense to murder," and that trial counsel's professed reasons for not investigating the use of expert testimony do not withstand scrutiny.[8] Nevertheless, we cannot say that the SJC's holding that counsel's failure to introduce expert testimony did

---

[8] Trial counsel explained that he had decided not to consult an expert because he was "afraid that an expert would . . . tell [him] that his opinion was that [Mello] had specific intent." Of course, if the expert had offered that opinion, trial counsel need not have called him to testify at trial.

-15-

not create a substantial likelihood of a miscarriage of justice is objectively unreasonable. Williams, 529 U.S. at 409. The evidence at trial suggested that Mello planned the arson and the getaway with some care the night of the fire. Moreover, Dr. Burglass's principal contention -- that the fire was a "proximal" consequence of the molotov cocktail that was comprehensible to Mello, whereas the death of those inside the building was a "distal" consequence beyond his understanding -- invites dismissive cross-examination. For example, at the Motion Hearing, the Commonwealth posed this question to Dr. Burglass: "So, in the continuum of proximal consequences [to] distal consequences then, where does the desire or the need or the foreseeing of having a getaway car fit in?" It was therefore not unreasonable for the SJC to conclude that Dr. Burglass's testimony would not likely have persuaded the jury to return a different verdict.

### b. Failure to Investigate Mello's Psychiatric History

The SJC addressed Mello's claim that trial counsel was ineffective in failing to investigate his psychiatric history in a footnote. Mello argues that the SJC applied the wrong standard of review when it found "no substantial likelihood of a miscarriage of justice" because there was "substantial evidence of Mello's ability to formulate the requisite intent." Mello, 649 N.E. 2d at 1119 n.17. In pointing to the existence of "substantial evidence" supporting the jury's verdict, rather than weighing the evidence supporting the verdict against the mitigating evidence introduced at trial and advanced in the habeas proceeding, the SJC, in Mello's

-16-

view, violated the rule set out in <u>Strickland</u> that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."  466 U.S. at 699.

We conclude that the SJC did evaluate the totality of the evidence as directed by <u>Strickland</u>.  Although the footnote in which the SJC rejected Mello's claim that trial counsel should have investigated Mello's psychiatric history does not include a weighing of the totality of the evidence, the footnote is appended to a discussion of trial counsel's failure to seek expert assistance on the issue of Mello's mental condition, in the course of which the SJC described Dr. Burglass's arguments and the unsuccessful intoxication defense Mello put on at trial.  Fairly read, the SJC's opinion does take into account the totality of the evidence in rejecting Mello's arguments.  We reject Mello's invitation to declare the SJC's decision contrary to the requirements of <u>Strickland</u> simply because the court's written opinion did not include an express declaration of what it unmistakably implies, that Mello's evidence is insufficient to undermine confidence in the jury's verdict.  <u>See</u> <u>id.</u> at 694.

### c. Failure to Exercise Peremptory Challenges

Mello argues that trial counsel was ineffective in failing to exercise a single peremptory challenge, despite the fact that one juror in this arson-murder case had a father who was a firefighter, and a second had a daughter who worked in a prison. The Commonwealth points out that the trial judge asked these jurors if they could be impartial, and they indicated that they could.

-17-

Although the decision by defense counsel of an accused arsonist to permit the child of a firefighter to sit on the jury seems odd, Mello fails to demonstrate any prejudice from the inclusion on the jury of a juror who swore that she could be fair and impartial. Nor can we say that it was objectively unreasonable of the SJC to conclude that trial counsel made no error in declining to exercise his peremptory challenges.

Mello urges us to adopt a rule that "counsel who exercises no peremptory challenges in a murder case and who fails to place his client's consent to this waiver on the record is the equivalent of the absence of counsel, requiring no proof of prejudice for reversal." We are aware of no federal precedent, and none has been cited, that stands for the proposition Mello urges. We therefore cannot say that the SJC's decision rejecting such a rule was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

### 2. "Hybrid" Ineffective Assistance of Counsel

#### a. Prosecutor's Closing Argument

Mello argues that trial counsel was ineffective in failing to object to the prosecutor's closing argument, in the course of which the prosecutor urged the jury to "do something" about the broad societal problems suggested by the unfortunate facts of his case, and to "do the duty that you've been sworn to uphold, to grant [Mello] a verdict of guilty." The SJC observed that "the prosecutor's statements urging the jury to do their duty and render a guilty verdict went beyond the bounds of permissible

-18-

advocacy," but concluded that this did not create "a substantial likelihood of a miscarriage of justice," and hence trial counsel's failure to object did not constitute ineffective assistance. Mello, 649 N.E.2d at 1111-12.

We are unmoved by the Commonwealth's suggestion that Mello's attorney "opened the door" to the prosecutor's improper argument with improper argument of his own. Since Mello's claim is ineffective assistance of counsel, we cannot dispatch his argument about trial counsel's failure to object to the Commonwealth's closing argument by pointing to yet another misstep trial counsel made. Likewise, the Commonwealth's contention that the prosecutor's closing argument must not have been so prejudicial if Mello's counsel failed to object plainly misses the point.

The SJC, however, offered reasonable grounds for rejecting Mello's argument, observing that "the prosecutor did not urge the jury to disregard the intoxication evidence," but instead "properly argued that, although intoxication is to be considered, the evidence in this case demonstrated that the defendant was not so intoxicated as to be incapable of forming the requisite intent." Id. at 1111-12. The SJC also explained that "the jury were instructed on the effects of voluntary intoxication on the defendant's ability to form the requisite intent, and that they should decide the case solely on the evidence before them." Id. at 1112. The SJC concluded that read as a whole and in conjunction with the jury instructions and the "significant evidence as to [Mello's] guilt," the closing argument did not create a substantial

-19-

likelihood of a miscarriage of justice, and hence there was no ineffective assistance of counsel. Id. We cannot say that the SJC's conclusion is objectively unreasonable. Williams, 529 U.S. at 409.

## b. Jury Instructions

Mello contends that his attorney was ineffective in failing to object to certain jury instructions. The SJC, in dealing with Mello's direct challenge to the jury instructions, held that some of the instructions were correct. It further held that others, even if erroneous, did not create a "substantial likelihood of a miscarriage of justice," and thus there was no ineffective assistance of counsel in failing to object.

Mello argues that trial counsel should have objected to the jury instructions on malice aforethought, an element of the crimes of first and second degree murder in Massachusetts. There are three ways to establish malice aforethought in Massachusetts: "(1) specific intent to cause death; (2) specific intent to cause grievous bodily harm; or (3) knowledge of a reasonably prudent person that, in the circumstances known to the defendant, the defendant's act was very likely to cause death." Commonwealth v. Sanna, 674 N.E.2d 1067, 1074 n.13 (Mass. 1997) (citing Commonwealth v. Grey, 505 N.E.2d 171 (Mass. 1987)). Mello argues that trial counsel was ineffective in failing to object when the judge instructed the jury that malice aforethought could be found upon a mere showing that "death follows from a purposeful, selfish, wrongful motive," or from "any other unlawful or unjustified

-20-

motive," or from "an evil disposition, a wrong or unlawful motive or purpose."  Mello argues further that an objection should have been made because the jury could have inferred from these instructions that "since he had confessed that he had an 'unlawful motive' when he set the fire, i.e., to burn the building, this charge permitted the jury to take his confession to arson as a confession to murder."

In ruling on Mello's direct challenge to the jury instructions, the SJC observed that "the malice instruction was not error free," but found "no substantial likelihood of a miscarriage of justice."[9]  Mello, 649 N.E.2d at 1116.  We need not linger over this aspect of Mello's appeal.  Any error in the trial judge's description of the third prong of malice could not have affected the verdict the jury returned.  Mello was convicted of first degree murder in the death of Starcher, which means the jury found that he killed Starcher with deliberation and premeditation.  A jury which believed that Mello killed with deliberation and premeditation must also have found that his conduct satisfied the first prong of malice, intention to kill.  As the SJC has explained in Commonwealth v. Serino:

> [t]he jury convicted the defendant of murder
> in the first degree on a theory of deliberate

---

[9]  Notwithstanding his errors, the trial judge did articulate a correct instruction in the course of his remarks, telling the jury: "you can infer malice aforethought from proof that in the circumstances known to the defendant a reasonable, prudent person would have known that according to common experience there was a plain and strong likelihood that death or grievous harm would follow his contemplated act."  See Sanna, 674 N.E.2d at 1074 n.13.

-21-

> premeditation. Only the first prong of malice
> can support a conviction of deliberately
> premeditated murder. The judge correctly
> instructed the jury on the first prong of
> malice . . . . Any error in the instruction
> on the third prong of malice is
> nonprejudicial.

765 N.E.2d 237, 245 (Mass. 2002); see also Commonwealth v. Wallace,
627 N.E.2d 935, 941 (Mass. 1994) (making similar point).

Likewise, Mello's conviction for second degree murder in
the death of Walsh was all but inevitable based on the felony
murder theory on which the jury was instructed. "The felony-murder
rule is based on the theory that the intent to commit the felony is
equivalent to the malice aforethought required for murder."
Commonwealth v. Prater, 725 N.E.2d 233, 242 (Mass. 2000) (internal
quotation marks omitted). Under Massachusetts law, the elements of
felony murder are (1) an unlawful killing, (2) committed in the
course of a felony, and (3) the defendant committed the felony with
a conscious disregard for human life. See id. at 241-42. A jury
that convicted Mello of the deliberate killing of Starcher must
have believed that he acted with a conscious disregard for human
life. We therefore conclude that Mello was not prejudiced by any
error in the instruction on the third prong of malice.

Mello also argues that trial counsel should have objected
to the judge's instruction that the jury did not have to believe
Mello's denial of any intention to kill Starcher. The jury was
instructed as follows:

> During the course of this trial, the
> defendant testified that he did not intend to
> kill anyone.

-22-

> Also, there has been testimony from certain police officers that the defendant made a similar statement to them.
>
> However, it's for you, the jury, to determine the defendant's intent. And you're not required, as a matter of law anyway, to accept the defendant's explanation.
>
> Despite the defendant's explicit denial of any intent to kill anyone, a jury may permissibly look at all the circumstances presented in the evidence to determine for itself whether the defendant possessed an intent to kill.
>
> The intention of the person is to be ascertained by his acts and the inferences that can be drawn from what is externally visible.

The SJC held that "[a]lthough the challenged instruction in isolation may have impermissibly warned the jury not to accept the defendant's testimony, in the context of the entire charge, the instruction did not create a substantial likelihood of a miscarriage of justice." Mello, 649 N.E.2d at 1115-16. Once again, we are unable to conclude that the SJC's holding was an objectively unreasonable disposition of Mello's appeal.

Finally, Mello argues that trial counsel should have objected to the trial judge's instruction to the jury that "as a general law, a person may be unconscious of what he is doing due to voluntary intoxication . . . and yet be held criminally responsible for his conduct." The SJC, however, held this statement of Massachusetts law to be correct. Id. 1115. Mello further contends that the trial judge impermissibly shifted the burden of proof onto him when he suggested that the jury could "find" that he was intoxicated, and that for Mello to avoid a conviction on first degree murder the jury would have to be "satisfied" that he was

-23-

incapable of forming a premeditated intent to kill. The SJC, however, concluded that "the charge as a whole clearly established that the Commonwealth had the burden to prove that the defendant had the specific intent to premeditate beyond a reasonable doubt." Id. Our review of the record convinces us of the reasonableness of the SJC's holding. See id.

### c. Atmosphere of Levity

Mello argues that "by repeatedly injecting levity into what should have been solemn proceedings, the judge suggested to the jury that he did not -- and thus that they need not -- take this trial seriously."[10] We agree with Mello that a number of the judge's remarks were inappropriate for a first degree murder trial. However, taking the objectionable remarks in the context of the trial as a whole, we do not discern a reasonable probability that, had counsel objected to the judge's demeanor, the outcome of the trial would have been different. Strickland, 466 U.S. at 694. Nor can we fault the SJC's conclusion that the jury did not become "so

---

[10] For example, the judge described the members of the jury pool who were not selected to be on the jury as having "escaped," and referred to those selected as "you lucky people." Early in the trial he explained to the jury that there would be a break during each session because "it gets kind of tiresome just sitting here, for all of us." The judge opined that a drawing displayed to the jury "won't win any art prizes" (the transcript indicates laughter at this point). When Mello's former girlfriend, identifying her former boyfriend, pointed to Mello, the judge joked: "Harrington [Mello's trial counsel, seated next to Mello], you wish" (the transcript again indicates laughter). Mello also characterizes as "gratuitous murder jokes" the judge's comments "we've just done away with the clerk" and "Hey, we'll eliminate you, too, if he keeps that up" (the latter remark elicited laughter).

intoxicated by the fun as to fail in their duties."  <u>Mello</u>, 649
N.E.2d at 1117 (internal quotation marks omitted).

### III. Admission of Mello's Confessions

Mello filed a pre-trial motion to suppress his two
written confessions that he started the fire -- given to police the
day after the fire -- on the ground that his statements were
involuntary because he was intoxicated at the time he made them.
After a hearing, the trial judge wrote "Denied" on Mello's motion.
Mello argues that the admission of the confessions was
unconstitutional because the "record does not demonstrate 'with
unmistakable clarity'" that the trial judge found the confessions
voluntary.

The SJC rejected this argument, holding that the trial
judge had expressly ruled that the confessions were voluntary.
<u>Mello</u>, 649 N.E.2d at 1112-13.  Mello argues that the SJC's decision
was "contrary to and an unreasonable application of" <u>Sims</u> v.
<u>Georgia</u>, 385 U.S. 538 (1967), which states that a trial judge's
conclusion that a confession is voluntary "must appear from the
record with unmistakable clarity."  <u>Id.</u> at 544.  <u>Sims</u>, however, is
consistent with the SJC's decision.  The trial judge in <u>Sims</u> had
made "absolutely no ruling" on the issue of voluntariness, but
rather submitted the issue to the jury without any initial
determination that the confession had been freely given.  <u>Id.</u> at
544.  Here, in contrast, the trial judge endorsed the motion to
suppress "Denied."  Although the motion was cursory, and included
no variant of the word "voluntary," we cannot fault the SJC's

-25-

conclusion that the trial judge understood the motion to be challenging the voluntariness of Mello's confessions, and that in writing "Denied" on the motion the trial judge made unmistakably clear that he was rejecting it.

Mello also argues that the trial judge neglected the requirement of Massachusetts law that a finding of voluntariness beyond a reasonable doubt must appear in the record with unmistakable clarity. Commonwealth v. Tavares, 430 N.E.2d 1198, 1206 (Mass. 1982). He contends that it is not apparent from the record that the trial judge applied the "beyond a reasonable doubt" standard in ruling on the voluntariness of Mello's confession, and that the SJC's failure to require that a finding of voluntariness beyond a reasonable doubt appear in the record with unmistakable clarity amounted to a "departure from settled Massachusetts precedent" and thus "violated federal constitutional principles of due process."

However, 28 U.S.C. § 2254 does not authorize federal courts to decide questions of state law. The SJC rejected Mello's argument that the trial judge failed to use the "beyond a reasonable doubt" standard in ruling that the confession was voluntary:

> The judge submitted the issue of voluntariness to the jury, as he was required to do, under comprehensive instructions of law that indicated his awareness of the proper standard of proof. It makes no sense to think that the judge knew the standard which governed the jury's determination of voluntariness, but may not have apprehended that the same standard applied to his decision on the motion to suppress.

-26-

<u>Mello</u>, 649 N.E.2d at 1112-13.  It is not our place to second-guess the SJC on the state-law question of whether the <u>Tavares</u> standard -- which is not a requirement of federal law -- was met in this case.

### IV. Cumulative Error

Mello argues finally that the cumulative impact of the errors of trial counsel and the trial court denied him due process of law.  The SJC concluded that "the trial . . . was not so riddled with error that it lacked the appearance of fairness and impartiality necessary to satisfy due process."  <u>Id.</u> at 1120 (internal quotation marks omitted).  Based on our analysis of Mello's ineffective assistance of counsel claims and his argument that his confession should have been suppressed, we cannot say that the SJC's rejection of his cumulative error argument "was contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).

**<u>Affirmed</u>**.